Joan SUBECZ, Plaintiff, Appellant,

v.

David M. CURTIS, Defendant, Appellee.

No. 71-1383.

United States Court of Appeals,
First Circuit.

April 24, 1973.

On Reconsideration July 13, 1973.

264

Albert P. Zabin, Boston, Mass., with whom Schneider & Reilly, Boston, Mass., was on brief, for appellant.

Lionel H. Perlo, Boston, Mass., with whom Jacob J. Locke and Ficksman & Conley, Boston, Mass., were on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Laszlo Subecz, husband of the plaintiff-appellant, entered Cape Code Hospital on Saturday evening, June 29, 1968, coming under the care of the defendant-appellee, a general surgeon. He had suffered a head injury, was disoriented, restless and perhaps periodically unconscious. He died at the hospital thirty-seven hours later.

In this diversity action for his alleged wrongful death and conscious suffering, plaintiff appeals from a judgment for the defendant entered pursuant to the jury's verdicts. We affirm.

The sole question arises from the testimonial equivocation of one of plaintiff's two experts, a neurosurgeon, concerning the existence of a causal connection between defendant's failure to call a neurosurgeon and Subecz's death. The witness, Dr. Humphreys, testified that not calling a neurosurgeon after twenty-four hours was a mistake, but, on both direct and cross examination, he testified that it was "problematic" and "speculative", from the hospital record, whether there would have been a different end result.[1] On redirect, counsel tried to ask Dr. Humphreys if he had not told him before trial that "the probabilities were that prompt surgical intervention would have saved this man's life." Before the witness could answer, the court called counsel to the bench. Plaintiff's counsel vigorously asserted a

1. His testimony indicates that he reached this conclusion because of an absence of localizing signs in the hospital record which would have provided a neurosurgeon with information sufficient to cause him to decide to operate.

right, under M.G.L. c. 233 § 23,[2] to elicit prior statements. *See* F.R.Civ.P. 43. The court then ordered a voir dire to see "what if any foundation for impeaching Dr. Humphreys" plaintiff's counsel could lay.

At the voir dire, Dr. Humphreys testified to telling counsel that there were obvious errors made in clinical judgment. He said, "[I]f the blood clot could have been drained, probably the patient would have lived, if it had, but this, again, I used the word—the word today that was brought up was speculation, and all medical judgments actually are to me speculation. . . ." He also testified that "the whole picture, all pulled together . . . as to whether or not having neurosurgical procedure accomplished . . . contributed to the patient's death." He explained the causal relationship between death and failure to call a neurosurgeon as based on the possibility that if the neurosurgeon had examined the patient he might "have seen something that has not been revealed in the record which would lead him to operate, and this is why it is speculation, my trying to put myself in another neurosurgeon's mind." Dr. Humphreys said he had not mentioned to the jury certain of the clinical errors because he had not been asked about them, and because concentrating on the mistake of not calling a neurosurgeon, he had forgot to do so. Towards the end of the voir dire, the court ruled that it would not permit impeachment, stating that "what we want here is the doc-tor's best opinions such as they are today." It concluded that it would permit only some "small" questioning, limited to the doctor's use of the word "speculation" and "maybe something along the lines of causal relationships."[3] No objection to its rulings were registered by plaintiff's counsel.[4]

Thereafter, the jury having been brought back, plaintiff's counsel proceeded with redirect, asking, among other questions, for Dr. Humphreys' opinion "as to the probable relationship between the patient's death and what you have termed the doctor's error of judgment." Dr. Humphreys replied that if drainage of the blood clot had taken place, "probably you would have had a live patient. The condition of this live patient, I cannot say what it would be or what the residuals would be or [of] such a procedure."

On recross, Dr. Humphreys gave further testimony favorable to plaintiff: that patients with big blood clots go on to death unless there is neurological intervention; that while even if with intervention they may die, it is "giving the patient a chance"; that "I still say if consultation had been called by a neurological surgeon, the probability of something being done would be great as far as this patient was concerned;" that "one cannot foretell the end result, but the patient should be given the benefit of whatever should happen to him." The force of this testimony was at the end diminished, however, by the doctor's agreeing with defendant's counsel, "You

2. M.G.L. c. 233 § 23 allows the party producing a witness to "prove that he has made at other times statements inconsistent with his present testimony; but before proof of such inconsistent statements is given, the circumstances thereof sufficient to designate the particular occasion shall be mentioned to the witness, and he shall be asked if he has made such statements, and, if so, shall be allowed to explain them."

3. The court said, prior to its ruling, "I would think that there may have been some lack of clarity because of the questions put or because of the circumstances."

Also, that the opinion as to causation should be submitted to the jury, "because I don't think the jury understands that that is the doctor's opinion."

4. Earlier in the voir dire the court said that it would not permit any revival of the question of what the error of judgment was, or the errors of judgment, but would permit the doctor's explaining of his understanding and use of the word "speculate". Plaintiff's counsel interjected "Fine". After the court said, "I will not permit any impeaching of the Doctor," counsel stated, "All right."

can only speculate as to the end result. You cannot foretell, because that is in the hands of God." Plaintiff's counsel, to offset this final, telling lapse, arose and asked (on what the record reflects as "further redirect examination"),

"Well, Doctor, with respect to the result of prompt neurological treatment; you have testified in this courtroom in the absence of the jury that the probabilities are that prompt neurosurgical treatment would have saved this man's life, haven't you?"

The court excluded the question. Plaintiff's counsel saved his rights and stated that his offer of proof was "my examination of the doctor on this subject matter and during the voir dire."

■■ Plaintiff's objection and offer of proof relating to the above question came too late to save for appeal her present attack on the court's broad rulings, made at the voir dire, forbidding impeachment of the doctor. Counsel did not object to these earlier, controlling rulings. That he had initially claimed a right to show prior inconsistent statements did not preserve the point. The court had thereafter held the voir dire in order to secure pertinent information; it had then ruled. At that point, if counsel was dissatisfied with the stated testimonial restrictions, he should have so indicated on the record. Instead, he proceeded without complaint through the remainder of redirect and through recross. Beyond presenting and arguing a point, an objecting party has a further duty to make clear, after the ruling, that he is still pressing it. Krause v. Chartier, 406 F.2d 898, 901 (1st Cir. 1968). Otherwise, unaware of the party's continuing objection, the court is deprived of the opportunity, or at least of any good reason, to reconsider its ruling See Welch & Corr Construction Corp. v. Harris E. Wheeler, Jr., et al., 470 F.2d 140, 141 (1st Cir. 1972).

■■ Plaintiff did, it is true, preserve her rights as to the single question excluded on further redirect. But even if several of the court's grounds for exclusion were incorrect, we would find no material prejudice. Nothing in the doctor's *voir dire* testimony leads us to believe that the witness's response would have added anything new or different. The court itself said—besides declining to permit impeachment, "[H]e has testified on this topic I think now before the jury at least twice and maybe three times . . . he has done as much clarifying as I am going to permit." The court's discretion to curtail or prevent further examination after redirect is substantial. We would find error here only if plaintiff had been deprived of the opportunity to answer new matter suddenly introduced for the first time. The doctor's testimony upon recross had raised no such new matter. We thus find neither error nor material prejudice in the court's ruling to exclude the question.

We do not, however, leave the matter there. Even had the plaintiff objected to the earlier key rulings, we would affirm. We would do so even though we disagree with the district court to the extent it may have believed that prior inconsistent statements of an expert may never be shown by the party calling him. (As to that question, we see no reason, and are aware of no authority, for limiting the Massachusetts statute to "fact witnesses". *Also see* Liddle v. Old Lowell Nat. Bank, 158 Mass. 15, 32 N.E. 954 (1893); McGrath v. Fash, 244 Mass. 327, 139 N.E. 303 (1923), and 3A Wigmore on Evidence, § 1041 at 1055 (1970 Chadbourn Rev.).)

■ While Massachusetts permits prior statements to be shown by the party calling a witness, the statements must be "inconsistent" and, even if inconsistent, may not be received for their truth. Wheeler v. Howes, 337 Mass. 425, 427, 150 N.E.2d 1, 2 (1958), *and see* cases cited in Wigmore, *supra,* § 1018 at 998, n. 3. We think the threshold need to show inconsistency is greater where a party is examining his own rather than an adversary witness, for the risk is greater that the party will get before

the jury statements which the jury will improperly receive for their truth and as rehabilitative, not contradictory, of the witness. *See* Wigmore, *supra*, § 1043 at 1059–1061.[5]

In the present case, we think the court could have believed that what was sought was not impeachment in its proper sense—i. e. undermining the doctor's credibility by showing that he had authored different tales at different times —but rehabilitation and supplementation —i. e. placing before the jury, for its truth, a hopefully stronger expression of opinion than the witness was now willing to give. Further, plaintiff could not point to any previous written statements of the witness (other than a cryptic letter, introduced at the voir dire, which did not deal with causality).[6] Hence plaintiff's "impeachment", if allowed, would have to consist of leading questions from counsel ("Doctor, at that time, didn't you tell me that. . . ."), permitting, in effect, testimony by counsel as to what the neurosurgeon had supposedly once told him.

In any event, as the witness's entire testimony on voir dire revealed (insofar as he would concede) no significant inconsistencies between his past and present opinions, we are not prepared to say that the court abused its discretion in refusing to permit a free-ranging examination more likely designed to shore up weaknesses in present testimony than to undermine the credibility of plaintiff's sole neurosurgical expert.

And for the same reason, while we would not have found error had the testimony to some reasonable degree been let in, we are satisfied that there was no material prejudice. The opinions of the neurosurgeon were adequately presented.

*Affirmed.*

## OPINION ON RECON-SIDERATION

After our opinion, we learned for the first time of Asaro v. Parisi, 297 F.2d 859 (1st Cir. 1962), cert. denied, 370 U.S. 904, 82 S.Ct. 1250, 8 L.Ed.2d 400 (1962). That was an action by a seaman under the Jones Act and maritime law, not a diversity case. The district court there admitted, for impeachment only, a witness's handwritten version of what another witness had earlier told him. We held, "There was no error in admitting the statements into evidence

5. The inconsistency requirement is usually self-regulating when an opposing witness is on the stand. If the prior testimony turns out to be consistent with present testimony, no one loses but the cross-examining party. It should be admitted so long as it fairly tends to control or qualify present testimony. *See* W. Leach & P. Liacos, Handbook of Massachusetts Evidence, 114 (4th ed. 1967). We do not say that the rule is or should be much different where the witness is the examiner's own; however, we think the court in marginal cases has greater discretion to exclude where the impeaching purpose of the prior statements seems plainly subordinate to their rehabilitative and shoring-up aspect.

Should prior statements be admitted for their truth, as under Rule 801 of the Rules of Evidence for the United States Courts, pending before Congress to be effective July 1, 1973, and as urged by several commentators, e. g., Wigmore, *supra*, § 1018 at 996 and n. 2, C. McCormick, Law of Evidence, § 251 at 601–

604 (2d ed. 1972), the balancing of factors which we find to allow exclusion might be tipped more towards admissibility. *See* Rule 801, Advisory Committee's Note, Subdivision (d) (1) (A), especially as to "turncoat" witnesses. Even so, we are not convinced that a different outcome would be indicated here. In any event, we cannot say the trend towards the proposed rule is now so unmistakable as to warrant our adopting it prior to the time that Congress acts upon the new rules, *see generally* cases cited in Wigmore, *supra*, § 1018 at 996–1007, notes 2–3; nor can we assume that Massachusetts must by now have adopted it. *Cf.* M. S. Walker v. Travelers Insurance Co., 470 F.2d 951, 952–953 (1st Cir. 1973). *Compare* F.R.Civ.P. 43(a) *with* 43(b).

6. We do not suggest that the prior statement need be in writing. The lack of writing was merely significant here as a further factor in borderline circumstances bearing upon the court's exercise of discretion.

as exhibits for the limited use [i. e. impeachment] permitted by the charge." We went further, however, to negate the argument that allowing the jury to take the statements to the jury room made it almost certain that the jurors would disregard the charge and give them evidential weight. Judge Woodbury, writing for this court, expressed agreement with Dean Wigmore's view that testimonial credit might properly be given to extra-judicial statements, saying the "orthodox rule is not realistic." The court stopped there.

At our invitation the parties have submitted careful and competent briefs on the possible effect of Asaro v. Parisi upon our earlier opinion. We are not disposed to change our opinion.

■■ In the present case, admissibility of the alleged prior statement was sought under M.G.L. c. 233 § 23, the rule "of evidence applied in the courts of general jurisdiction of the state in which the United States Court is held." F.R.Civ.P. 43(a). As state law affords the rule which favors reception, we referred in our opinion to the corollary state rule, which in Massachusetts is the "orthodox" rule giving only "impeachment" effect to prior inconsistent statements. See Wheeler v. Howes, 337 Mass. 425, 427, 150 N.E.2d 1, 2 (1958). Moreover, we read the Asaro v. Parisi dictum less as a definitive adoption by this circuit of the Wigmore view than as an indication that we will not strain to find prejudicial error if prior inconsistent statements are admitted without orthodox constraints. In Asaro, the district judge had, in fact, charged the orthodox way. We do not think it can yet be said, in this circuit or in the nation, that the Wigmore view has achieved status as the rule "of evidence heretofore applied in the courts of the United States on the hearing of suits in equity" (F.R.Civ.P. 43(a)), hence compelling upon district courts even in diversity actions. Cf. Hope v. Hearst Consolidated Publications, Inc., 294 F.2d 681 (2d Cir. 1961), cert. denied, 368 U.S. 956, 82 S.Ct. 399, 7 L.Ed.2d 388 (1961).

The ruling below depended upon a number of factors, of which the rule in question was but one. As pointed out in footnote 5, we are not convinced that a different result would be indicated even under the Wigmore view. See e. g., United States v. Nuccio, 373 F.2d 168, 172 (2d Cir. 1967), cert. denied, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1967). We are satisfied in light of all circumstances that the district court did not abuse its discretion, and that prejudicial error was not committed.