Freyda SALTZMAN, Plaintiff-Appellant,

v.

FULLERTON METALS COMPANY,
Defendant-Appellee.

No. 80–2562.

United States Court of Appeals,
Seventh Circuit.

Argued June 1, 1981.

Decided Oct. 6, 1981.

Laurie E. Leader, Michael Lee Tinaglia, Chicago, Ill., for plaintiff-appellant.

Sheribel F. Rothenberg, D'Ancona, Pflaum, Wyatt & Riskind by Jay Riskind, Robert Gettleman, Sheribel Rothenberg & Ellen Fredel, Chicago, Ill., for defendant-appellee.

Before SPRECHER and CUDAHY, Circuit Judges, and EAST,[*] Senior District Judge.

CUDAHY, Circuit Judge.

Plaintiff Freyda Saltzman is appealing from an adverse judgment in her suit charging sexual discrimination in employment. Plaintiff's complaint is framed in three counts. Count I alleges that defendant Fullerton Metals Co. ("Fullerton") violated the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (1976), by paying plaintiff less than a similarly situated male employee, James Carlin. Count II alleges a violation of the Illinois Fair Employment Practices Act based upon Fullerton's alleged discharge of plaintiff. Ill.Rev.Stat. ch. 48, § 851 *et seq.* Count III alleges a claim under Article I, Section 17 of the Illinois Constitution of 1970 on some unspecified theory.

Count II was tried to the court without a jury. The district court found that plaintiff had not been involuntarily terminated and thus entered judgment for the defendant. In the words of the district court, plaintiff voluntarily left Fullerton "by mutual agreement" and "was not fired or discharged." Therefore, the district court did not reach the question whether the discharge was itself lawful.

Counts I and III were tried to a jury. The jury found for the defendant on both counts and the district court entered judgment for Fullerton accordingly. Plaintiff

[*] The Honorable William J. East, Senior District Judge for the District of Oregon, is sitting by designation.

now appeals from the adverse judgments with respect to Counts I and II.[1] We affirm the district court's judgment with respect to Count I but reverse and remand the judgment entered on Count II.

## I. Background

Fullerton hired plaintiff in 1972 as a clerical worker in its Credit Department. By 1976, plaintiff spent half of her time in collection. The remainder of her time was spent on credit extension and various other duties. When making credit decisions, plaintiff used past payment history and reports of credit services to guide her. Plaintiff did not have the ability to analyze financial statements and did not handle accounts with complex financing.

Because of increased work in the Credit Department, Fullerton officials approached plaintiff regarding the possibility of adding another employee to the credit department. Plaintiff felt threatened by the development and, in June of 1976, threatened to quit. Fullerton gave plaintiff a bonus, a raise and a new job title (although no new responsibilities) in order to placate her.

In July of 1976, Fullerton decided to transfer James Carlin to plaintiff's department as "Assistant to the Corporate Credit Manager." Plaintiff protested that the title indicated that Carlin would be more important than she was. Once again, Fullerton acceded to plaintiff's wishes and changed Carlin's title.

Carlin arrived in plaintiff's department in September of 1976. Plaintiff was "uncomfortable" and "felt threatened." Two

weeks later, plaintiff allegedly overheard a conversation mentioning Carlin's name and a salary of $16,500. At that time, plaintiff was making $13,500 a year.

Plaintiff demanded a meeting with her superiors and presented them with the salary disparity. No one denied that the disparity existed but another meeting was scheduled to include a vice-president of Fullerton who was out of town at the time of the first meeting. At this second meeting on September 26, 1978, plaintiff was either fired or quit, depending upon how one interprets the facts. Plaintiff then filed this suit challenging her alleged discharge as well as the salary disparity.

## II. Count II: Did Plaintiff Leave Fullerton Voluntarily or Was She Discharged?

■ The district court found that plaintiff left Fullerton's employ voluntarily. This finding may not be set aside on appeal "unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Fed.R.Civ.P. 52(a). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

In the instant case, the evidence centered on the meeting on September 26, 1978, at which plaintiff complained of the disparity in her salary vis-a-vis her male counterpart, James Carlin. Kenneth Riskind, then exec-

---

1. Plaintiff's lengthy briefs make only scattered references to Count III in the statement of issues and in the conclusion to the reply brief. Count III is not mentioned anywhere in the analytical portions of the two briefs. We decline to consider plaintiff's arguments insofar as they relate to Count III because of this failure to comply with Fed.R.App.P. 28(a)(4). *See Cannon v. Teamsters & Chauffeurs Union*, 657 F.2d 173, 177–78 (7th Cir. 1981).

On its face at least, plaintiff has a difficult task maintaining that Fullerton violated Article I, Section 17 of the Illinois Constitution. That provision prohibits employment discrimination in "the hiring and promotion practices of any employer." Plaintiff admitted at trial that Full-

erton never discriminated against *her* on the basis of sex in its hiring or promotional practices. Tr. 123. A broader interpretation of the provision to cover discrimination with respect to salary and discharges is arguably correct, however, *see* Gertz, The Unrealized Expectation of Article I, Section 17, 11 J. Marshall J. of Prac. and Proc. 283, 290–92 (1978), even though this interpretation was not argued on appeal or presented to the jury in the instruction on Count III. We feel that the uncertainty with regard to the interpretation of this provision of the Illinois Constitution makes it even more important to decline to consider Count III where the briefing has been so inadequate.

utive vice president and treasurer of Fullerton, Walter Krauss, Credit Manager and plaintiff's immediate superior, and Larry Isaac, Fullerton's Controller, were also present at the meeting. These four people testified to substantially the same discussion. In the critical phases of the conversation, Riskind explained that the salary disparity was the product of differing responsibilities. Plaintiff indicated that she was still unhappy with the differential. Riskind then said "Well, maybe—perhaps you ought to look for work elsewhere." Plaintiff replied, "Are you telling me to leave?" Riskind responded that plaintiff was "pushing us" and that, "Well, what choice do we have?" "Maybe you'd better leave." Tr. 291–93; 428; 478–80. At that point, plaintiff broke Krauss' zebra plant, placed a portion of it on his desk and left the meeting. She then packed up her belongings and left Fullerton's offices before anyone else spoke to her about this subject. The district court concluded that plaintiff was unhappy and, essentially, left her job voluntarily because she could not accept the salary disparity.

Obviously, Riskind did not come out directly and tell plaintiff that she was fired. Phrasing an employee's discharge in terms like "maybe you'd better leave" is not sufficient, however, to insulate an employer from potential liability for wrongful discharge. Regardless of the words used, we must confront whether plaintiff left her job voluntarily. Despite the ambiguity present in the statements made at the meeting, all three Fullerton executives testified that plaintiff had been "terminated," a characterization inconsistent with a voluntary separation. Tr. 308, 528 (Krauss); Tr. 442 (Isaacs); Tr. 508 (Riskind).[2]

The involuntary nature of plaintiff's termination was also confirmed in a letter Fullerton sent to plaintiff following her discharge. The letter stated:

> [u]nder Illinois law we are obliged to offer you the opportunity to stay in our group insurance program for up to six weeks after leaving the company . . . .

Tr. 447. Attached to the letter was a copy of a form addressed to Fullerton's insurance company advising it that plaintiff was "involuntarily terminated as defined by Illinois P.A. 79–95, H.B. 761, from our plan of group accident and health insurance." Tr. 449. This form explicitly characterized plaintiff's separation as an "involuntary termination." In addition, the very fact that Fullerton sent a letter to plaintiff concerning the possibility of continued insurance benefits is highly probative. The Illinois law in question, Public Act 79–95, House Bill 761, Ill.Rev.Stat. ch. 73, § 979.1 (1975) (expired July 1, 1977), required such interim insurance benefits only when the employee had been involuntarily terminated.

In light of the foregoing evidence, we must determine that the district court's finding of fact was clearly erroneous and that plaintiff was, in fact, discharged. Instead of our proceeding to a determination whether that discharge was unlawful, however, we note that the claim was not specifically addressed by the district court, and we think that the better policy would be to remand this matter for initial consideration by the district court.

### III. Count I: The Denial of a Fair Trial

Plaintiff challenges the adverse jury verdict on Count I, her Equal Pay Act claim, based upon several alleged deficiencies concerning the conduct of the trial and discovery. Plaintiff argues that these deficiencies, either separately or cumulatively, operated to deprive her of a fair trial. Plaintiff's burden is a heavy one for she must convince us that the trial was flawed in a manner that affected plaintiff's rights so that a refusal to grant a new trial is "inconsistent with substantial justice." Fed.R.Civ.P. 61; 28 U.S.C. § 2111 (1976).

#### A. Travel Vouchers

■ One of Fullerton's principal defenses at trial to plaintiff's Equal Pay claim was that plaintiff's job differed from that of her purportedly parallel male counterpart, James Carlin. Carlin, unlike plaintiff, trav-

---

**2.** Plaintiff also testified that she had been discharged. Tr. 81–82.

elled extensively to visit customers to evaluate their credit needs.

At trial, there was some dispute over the extent of Carlin's travel responsibilities. Walter Krauss was plaintiff's and Carlin's immediate supervisor and he testified to the critical facts concerning Carlin's travel. On direct examination, Krauss testified that Carlin travelled 25% to 35% of his time on the job while plaintiff did not travel in this capacity. Carlin travelled "in a training mode" and usually called on customers with Krauss.

On cross-examination, plaintiff's counsel went through all of Carlin's travel vouchers that had been produced in response to several discovery and pretrial requests. Plaintiff's counsel established that, in her view, only a few of those vouchers pertained to travel to call on customers concerning credit matters. Plaintiff's counsel thus tried to impeach Krauss by showing that his estimate of Carlin's time involved in travel (at 25% to 35%) was excessive.

On redirect, Krauss explained that the absence of the vouchers was the result of the fact that Carlin often travelled with Krauss and Krauss would submit vouchers on behalf of both of them for such trips. Tr. 335. Krauss also testified that at least a portion of Carlin's gasoline vouchers would have been for travel purposes even if not specifically identified as such.[3] Krauss then testified that when Carlin travelled on airlines, his arrangements were made by a travel agency and billed directly to the company. When Fullerton sought to introduce the records of six airline ticket transactions for trips taken by Carlin, plaintiff's attorney objected vehemently. Out of the presence of the jury, plaintiff's counsel explained that these new records had not been provided by Fullerton in response to several discovery and pre-trial requests. Plaintiff sought to exclude the documents to prevent the written corroboration of Krauss' testimony on redirect. After considerable discussion, the judge ruled that the documents should be admitted. Krauss then went on to testify that travel agency bills would be paid by Fullerton as a routine accounts payable. The individual travelling would not personally pay for the tickets (and be reimbursed by Fullerton) so that there would be no separate travel voucher identifiable as such.

Krauss then again testified that he would normally pick up the tab when travelling with Carlin and would submit a reimbursement voucher encompassing Carlin's expenses. Tr. 346–47. Since Carlin often travelled with Krauss, this arrangement would further explain the paucity of travel vouchers executed by Carlin himself. Krauss' testimony in this regard was corroborated in two instances by the admission of travel vouchers signed by Krauss that specifically mentioned Carlin. Neither of these two vouchers had been produced prior to trial in response to plaintiff's requests.

On appeal, plaintiff contends that the district court should have excluded the six airline invoices and the two Krauss travel vouchers because of Fullerton's failure to comply with plaintiff's discovery request. We agree that Fullerton should have provided these documents prior to trial.[4] It may have been within the district court's discretion to exclude this evidence because of the discovery default, although the cases cited by plaintiff on this point involve much more egregious breaches of discovery obli-

---

3. On cross-examination, plaintiff's counsel had attempted to show that Carlin's numerous gasoline vouchers were not "travel related" because such vouchers included reimbursement for personal travel by Carlin.

4. Fullerton's argument to the contrary is based upon an overly technical reading of plaintiff's pre-trial requests. For example, Fullerton contends that these documents were not within the purview of plaintiff's request to Produce for Trial because they were not "travel vouchers of . . . James Carlin." This interpretation of the good faith duty to comply with discovery requests smacks of gamesmanship and is contrary to the purposes of modern discovery provisions to promote the fair and efficient resolution of disputes. *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 892–93 (7th Cir. 1981).

gations than appear here.[5] We do not agree, however, that the admission of the documentary evidence was sufficiently prejudicial to require a new trial. Krauss' testimony on redirect had effectively undercut plaintiff's attempts to show that only a few vouchers supported Krauss' earlier testimony on cross-examination that Carlin travelled much more than plaintiff.[6] It was obvious from the testimony that there was more to Carlin's travel than the few trips represented by those five or six vouchers deemed pertinent by plaintiff's counsel. While plaintiff's counsel may have altered her cross-examination strategy if she had known of the additional documents,[7] the possible prejudice from the admission of the documents does not convince us that a new trial is required to comport with prevalent notions of "substantial justice." 28 U.S.C. § 2111 (1976).

### B. Restrictions on Cross-examination

In addition to its attempt to differentiate plaintiff's job from Carlin's job by reference to their respective travel responsibilities, Fullerton put on evidence that Carlin was paid more than plaintiff because he was a trainee in a *bona fide* management training program. Participation in such a program could justify a salary disparity under the Equal Pay Act. 29 U.S.C. § 206(d)(1)(iv) (1976). *Marshall v. Security Bank & Trust Co.*, 572 F.2d 276, 279 (10th Cir. 1978). Plaintiff attempted to show at trial, however, that the alleged training program was too informal to qualify as a *bona fide* program for Equal Pay Act purposes. *Hodgson v. Fairmont Supply Co.*, 454 F.2d 490, 497–99 (4th Cir. 1972).

Krauss, Isaac and Carlin testified that Carlin participated in Fullerton's training program, that the training program had not been reduced to writing and that there were few participants. On direct examination, Riskind testified to substantially the same effect. On cross-examination, plaintiff's counsel began to ask Riskind about the composition and administration of the training program. The district judge cut the cross-examination short and plaintiff was prevented from questioning Riskind about the details of the training program. Plaintiff now argues that the curtailed cross-examination denied her a fair trial. Plaintiff contends that Riskind would have provided more specific information about the training program than either Krauss or Isaac because he appeared to possess more authority over the program. Riskind was also responsible for selecting Carlin for the program.

But plaintiff's offer of proof failed to describe either of these aspects of Riskind's potential testimony, which would render the limitation of his cross-examination prejudicial. Plaintiff's counsel merely stated that

> I think that the evidence would show that the training program was not a formal training program and it did not reach the level that would sustain the burden of proof of defendant's affirmative defense in regard to a bona fide training program.

Tr. 511–12. This conclusory offer of proof disclosed neither of plaintiff's particular needs for cross-examination argued on appeal and failed to set out any testimony not

---

5. *See, e. g., Shelak v. White Motor Co.*, 581 F.2d 1155 (5th Cir. 1978) (sudden last minute shift in the theory of damages); *Nutt v. Black Hills Stage Lines, Inc.*, 452 F.2d 480 (8th Cir. 1971) (same). Here, in contrast, plaintiff was aware that Carlin's travel was an issue but was merely unaware of some of the written substantiation of Carlin's travel time.

6. Krauss testified that when Carlin went to credit meetings and visited branches he often called on customers. Tr. 349–50. Plaintiff had attempted on cross-examination to exclude Carlin's vouchers for visits to branches and credit meetings from substantiating Carlin's to-

tal travel time. Krauss had also previously testified that he submitted travel vouchers covering both himself and Carlin and that Carlin's gasoline vouchers included some customer travel.

7. Prior to the start of her cross-examination of Krauss, counsel for Fullerton attempted to warn plaintiff's counsel that there were additional travel documents. Tr. 311–12. It may have been prudent for plaintiff's counsel to inquire at that time, before her cross-examination had begun, about these additional documents.

cumulative of that provided by Krauss and Isaac.[8] If plaintiff's counsel had alerted the district court to the two particular reasons for Riskind's continued testimony now asserted on appeal, the district court may have reversed its earlier position. Such is the salutary purpose behind an offer of proof. As indicated by Rule 103(a) of the Federal Rules of Evidence.

> (a) Effect of erroneous ruling. Error may not be predicated upon a ruling which ... excludes evidence unless a substantial right of the party is affected, and
>
> ....
>
> the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

Finding no plain error in the restriction on further cross-examination, Fed.R.Evid. 103(d), we decline for the reasons noted to consider this alleged error.

■ Plaintiff's cross-examination of Riskind was also curtailed with respect to Fullerton's merit system. The Equal Pay Act does not prohibit employers from making salary distinctions based upon a *bona fide* merit evaluation system. 29 U.S.C. § 206(d)(1)(ii) (1976). *EEOC v. Aetna Insurance Co.*, 616 F.2d 719, 725–26 (4th Cir. 1980). Plaintiff argues that she was thus deprived of an opportunity to refute the merit system defense. While Fullerton had a merit system, no one testified that Carlin's higher salary was the product of Fullerton's merit system.[9] There was thus no issue raised as to whether Fullerton's merit system could constitute an affirmative defense under the Equal Pay Act. While the cross-examination should have been allowed

in order to emphasize the irrelevance of the merit system to the instant case, we do not find reversible error from the district court's limitation on Riskind's testimony. To find reversible error, we would have to assume that the jury might have found for Fullerton based upon a defense unsubstantiated by the evidence, and we decline to assume that the jury could have failed to follow its instructions. *Kelsie v. Trigg*, 657 F.2d 155, 157–58 (7th Cir. 1981).

### C. Comments Made by the Trial Judge

■ Plaintiff challenges the propriety of certain remarks made by the trial judge during the cross-examination of Riskind. Tr. 499. Plaintiff contends that the trial judge expressed his opinion that plaintiff's job and Carlin's job required unequal skill and qualifications. Because there was no objection, plaintiff is forced to argue that the judge's comments constituted plain error prejudicing plaintiff's right to a fair trial. *United States ex rel. Wilson v. Coughlin*, 472 F.2d 100, 109 (7th Cir. 1973). The judge's comments were phrased in terms of what the defendant's witnesses contended, however, and not in terms of his own beliefs.

Plaintiff also argues that the judge's comments foreclosed her counsel from demonstrating that Carlin's job did not require a college degree, making this additional qualification of Carlin irrelevant for Equal Pay Act purposes. *See* 29 C.F.R. § 800.125. Plaintiff's counsel continued to question Riskind concerning Carlin's qualifications other than his college degree, however, and we see no indication in the record that questioning of this sort was foreclosed.

---

**8.** Historically, the requirement of an offer of proof with respect to cross-examination was relaxed because the examining counsel was ordinarily assumed not to have had an advance opportunity to learn what the witness would answer. McCormick on Evidence, § 51, at 110 (2d ed. 1972). The Federal Rules of Evidence do not differentiate between the exclusion of evidence on direct and cross-examination and have not been applied to create such a distinction. *United States v. Vitale*, 596 F.2d 688, 680–90 (5th Cir.), *cert. denied*, 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979). We do not

feel that plaintiff's offer was sufficient even under a relaxed standard for cross-examination, however, and need not decide whether there are two standards. We also note that plaintiff was in possession of the information not supplied in the offer of proof at the time of the offer, and there is thus no need for a relaxed standard in this case.

**9.** According to the testimony at trial, Carlin's salary when he was transferred to the Credit Department was determined by his prior salary in the Sales Department. Tr. 481–83.

Certainly, no attempt was made to inform the trial judge of the arguments raised on appeal with respect to the irrelevance of a college degree. Our review of the whole record reveals that the comments of the trial judge do not constitute reversible error.

## IV. The Denial of Discovery

In several pre-trial discovery orders, the district court refused to compel Fullerton to answer certain interrogatories and to produce certain documents. Plaintiff asserts that the denial of this discovery prejudiced her "right to a fair trial under all counts of the subject complaint." Plaintiff's Brief at 35. The reference to "all counts" of the complaint presumably includes Count I. We decline to consider plaintiff's discovery argument insofar as it pertains to Count I, however, for plaintiff argued before the district court that the discovery was only relevant to Counts II and III. Pretrial Tr. of September 24, 1979 at 2, 7, 10; Plaintiff's Motion to Compel Answers to Interrogatories and to Compel Production of Certain Documents, August 20, 1979, ¶¶ 2, 4. We decline to consider arguments pertaining to Count I that are raised for the first time on appeal. *Laketon Asphalt Refining Inc. v. United States Department of the Interior*, 624 F.2d 784, 788 (7th Cir. 1980); *Merrill Tenant Council v. HUD*, 638 F.2d 1086, 1089 n.3 (7th Cir. 1981). With respect to Count III, we have already determined that we will not consider any of plaintiff's arguments because of the lack of specificity in her briefs on this point before this court. *See* note 1, *supra*.

Plaintiff's discovery issue thus narrows to Count II. Count II is based upon Fullerton's allegedly improper discharge of plaintiff. Since we have remanded Count II for a determination of the legality of that discharge, we shall proceed to consider the discovery issue to the extent that it relates to the unresolved issues pertinent to our remand of Count II.

On remand, plaintiff will have to establish that her discharge was unlawful in order to succeed on Count II. That claim will be based upon either or both of two theories: 1) that plaintiff was fired because she was a woman, or 2) that plaintiff was fired in retaliation for complaining about the salary disparity that she reasonably believed to be the result of sex discrimination. Ill.Rev.Stat. ch. 48, § 853(d) (1979).[10] Plaintiff's disputed discovery requests, in contrast, sought, *inter alia*, information about the employment records of all of the persons who worked at Fullerton's plant during the period of plaintiff's employment, the standards relating to Fullerton's merit evaluation system, guidelines for defendant's training program and various written job descriptions. On remand, much or not all of this information will be irrelevant. We shall allow plaintiff to seek discovery as to previous employees discharged by Fullerton, however, because such discharges could, in some cases, reveal a past history of discharging female employees relevant to the defendant's intent in discharging plaintiff. As to this line of discovery the district court should follow a liberal approach designed to ferret out all relevant facts about discharges of women employees. A request for "all personnel records" of all employees is too broad, however, given the narrowed focus of this litigation on remand.[11]

Affirmed in Part, Reversed and Remanded in Part.

---

**10.** In order to justify broader discovery, plaintiff has attempted to fashion a disparate impact theory that would encompass the circumstances of the instant case. We can see no basis, however, for applying this approach. There is no neutral employment practice in the instant case that falls more harshly on Fullerton's female employees. *City of Cairo v. FEPC*, 21

Ill.App.3d 358, 315 N.E.2d 344, 348 (1974). Rather, if one accepts plaintiff's allegations as true, Fullerton's actions would constitute a classic case of disparate treatment.

**11.** Circuit Rule 18 shall apply on remand. The parties shall bear their own costs on appeal.