nale of *Fondiller* should apply to a former trustee.

Accordingly, we *affirm.*

**David SAMPSON, d/b/a Sampson Associates, Plaintiff, Appellee,**

v.

**EATON CORPORATION, Defendant, Appellant.**

No. 86–1297.

United States Court of Appeals, First Circuit.

Argued Sept. 9, 1986.

Decided Jan. 16, 1987.

Victor Bass with whom Arthur P. Kreiger and Palmer & Dodge, Boston, Mass., were on brief, for defendant, appellant.

James R. Senior with whom Conn, Austin, Conn & Senior, Woburn, Mass., was on brief, for plaintiff, appellee.

Before COFFIN, Circuit Judge, WISDOM * and ALDRICH, Senior Circuit Judges.

BAILEY ALDRICH, Senior Circuit Judge.

This is a suit for breach of contract by David Sampson, a real estate broker, against Eaton Corporation, an Ohio company, purchaser from The Flatley Company of a sixty-acre parcel of land in Cherry Hill Park in Beverly, Massachusetts. Plaintiff, admittedly, was engaged by defendant to assist in the search for a site, but what this meant was in dispute, other than the fact that any brokerage fee was expected to be paid by the seller. Taking the evidence most favorably to plaintiff, he did briefly "show" the parcel at issue to defendant in January 1983, and included a reference to the Park generally in a notebook furnished defendant, though neither the parcel, nor the Park generally, met defendant's initial requirements. Defendant's interest in the property arose several months later, inde-

* Of the Fifth Circuit, sitting by designation.

pendently of plaintiff. Flatley paid a full fee, but to another broker, who provided substantial assistance to defendant in site analysis, negotiation, and other aspects of the purchase. In response to plaintiff's claim for damages for the lost opportunity, the jury charged defendant with what, based on the evidence, was approximately one-half of a regular brokerage fee. Defendant appeals following denial of its motions for judgment n.o.v., and alternatively for a new trial. We affirm.

There was no writing, and there were disputes as to what was said and as to what was implied from what was said; also, as to whether plaintiff performed his part of whatever agreement there was. We start with what the jury could have found the agreement to have been.

Plaintiff was the first witness. In response to strikingly leading questions, not objected to, he indicated that he was employed as an "exclusive broker," a term of art in the brokerage business. This occurred in the following manner. After recounting conversations with Timothy Burns, defendant's principal local representative, as to defendant's needs, plaintiff was asked,

Q. And what did Mr. Burns say to you concerning the site search going forward at that time?

A. He asked me if I would coordinate it and act as a buffer and act as their specific agent to identify and research opportunities that would be consistent with their needs.

Q. Did Mr. Burns and yourself have any discussion relative to what an exclusive agent [note that "specific agent" has now become "exclusive agent"] means?

A. Just to the extent that Mr. Burns was concerned that he would be descended upon by people such as myself and others in the industry who are looking to provide this service, and he didn't have the time or the disposition to handle all of these inquiries, and I would do that for him.

Q. Did he make reference what he meant by the term "to act as a buffer"?

The witness strayed, but without objection.

A. Part of the brokerage business is—you can call it two sections. One is that you need space and I go out and 5,000 other people go out and try to bring it to you. The other is that you needing space will designate an exclusive agent who will coordinate the search of known space and unknown space in addition to space that might be brought or space or property that might be brought to us by someone else.

Q. And with respect to that conversation [sic], did you and Mr. Burns have discussion relative to how your compensation was to be paid?

A. It was understood that I would be—it was understood and discussed that my relationship would be that I would be getting a brokerage fee from the sellers of the property.

Q. Now, the arrangement that you just talked about, is that one which was common to your business at that time, that type of an arrangement?

A. It is a very common practice in the industry.

Q. Was it a common practice for you at that time as well?

A. Yes.

Q. And the term "exclusive broker," [note that "exclusive agent" has now become "exclusive broker"] what does that import in the industry; and what does the term "coordinating a search" import in the industry relative to what, I guess customer, in this sense, potential buyer of real estate will do with respect to you and your collecting of the commission?

A. He will—the person, the company will put me in a position whereby all inquiries will be channeled or coordinated through me, and I will be insured a position relative to the acquisition of any property that might result from this effort.

Q. When you say "insured a position," what do you mean by that?

A. In my business, whoever brings a client to a piece of property, whether it be a building or land, the owner of that property, if it should be bought by the client, will pay my fee. In the event a sale takes place, the owner of the property, in order to recognize his obligation to pay a fee, wants to know who you are bringing; therefore, the client who retains you on an exclusive basis insures you that you will be able to represent, at the appropriate time, that you are the broker in charge of their account who will then be due the fee, whether it be a whole fee or split fee if there is someone else involved.

■ In sum, the word "exclusive" was used four times, by counsel, or by plaintiff, without any testimony that either plaintiff or Burns had, in actuality, used it. On this record, one might tend to agree with the statement in defendant's brief, "Burns did not ask [plaintiff] to be Eaton's exclusive agent," were there not an impediment. Not only did defendant not interfere with plaintiff's above-quoted testimony, but, on cross-examination, it fully accepted it.

Q. Mr. Sampson, in what you've called your agreement with Mr. Burns, I believe you said that you were going to be the exclusive agent of Eaton-Nova?

A. Yes.

. . . . .

Q. Mr. Sampson, you stated this morning that your arrangement with Mr. Burns in the fall of 1982, under that arrangement you were to have the exclusive brokerage for Eaton-Nova for long-term property?

A. Yes.

Even though some of plaintiff's subsequent conduct was, arguably, inconsistent with his claim of exclusivity, we must reject defendant's contention that plaintiff's claim of exclusivity was against the clear weight of the evidence.[1] It may well be, as

---

**1.** Too long to put in a footnote, an appendix to this opinion treats a further piece of evidence supporting plaintiff on this point, and defendant's unsuccessful attempt to impeach it.

defendant would now have it, that plaintiff's testimony was a mere self-generated understanding, having no basis in fact. Elementary advocacy, however, called for a response: either cross-examination to show lack of foundation for plaintiff's "understanding," or, at the least, cross-examination to show that it was not communicated to Burns. If this was thought dangerous because Sampson might add to his direct, and say that it was in fact communicated, so be it, but that was the chance defendant had to take, rather than leave the testimony standing whole. It is too late in this court simply to plead that Burns, who was pursuing a $4 million purchase, was to be excused because he was inexperienced.

As to what was to be performance, plaintiff was asked,

Q. Did you have an understanding as to what would happen with respect to a compilation of sites made by you in the event that they subsequently purchased one of those sites you already compiled?

A. I would be protected to register their name with the owner of the property for the purposes of receiving a fee.

. . . . .

Q. Was it ever a requirement that the site, if they purchased it, in order for you to get paid had to be nothing they knew of before your involvement?

A. Oh, no.

Again, there was no cross-examination.

■ To recapitulate, on plaintiff's evidence the jury could have found that he discussed various parcels of land with Burns, and "compiled" a list that he gave to Johnson, Burns' superior who later came on from Ohio; that this list included Cherry Hill Park, generally; that he showed Johnson a number of sites, including the particular locus in Cherry Hill Park that defendant ultimately purchased; that Johnson evinced no interest because defendant's requirements were not met; that they ceased most dealings with plaintiff, except as to another locus, which defendant

ultimately rejected; that some months later the head of the company came on from Ohio, and happened by the Cherry Hill locus, and was immediately interested; that defendant later negotiated for it with Flatley, employing another broker; that defendant failed to inform Flatley of plaintiff's position in the matter, and that Flatley paid a customary fee to the other broker. On this record the court charged the jury that plaintiff was basically a finder; that his promised remuneration was that he was to be afforded the opportunity, at the appropriate time, to become the broker, to be paid by the seller—but with no guarantee that the seller would accept him; that he would earn that opportunity if defendant purchased any property on the list compiled by him even if it had not met defendant's initial requirements, even if defendant had already known about it, and even if plaintiff was not the efficient and predominating cause of the purchase.

We agree that this was an unusual agreement, calling for a minimal amount of work, or benefit to defendant, and that it is customary to require a broker to have been the efficient or predominating cause. *See Julius Tofias & Co. v. John B. Stetson Co.*, 19 Mass.App.Ct. 392, 395, 474 N.E.2d 1162, 1165 (1985). A normal finder, too, must show a causal connection between his efforts and the transaction on which he seeks to recover. *See, e.g., Davidson v. Robie*, 345 Mass. 333, 340, 187 N.E.2d 371, 376 (1963); *Ehrman v. Cook Electric Co.*, 630 F.2d 529, 530 (7th Cir.1980) (applying Illinois law); *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 142, 269 N.E.2d 21, 24, 320 N.Y.S.2d 225, 229 (1971).

As against this, however, defendant did ask for some specific services, and if they be thought small, so, too, was defendant's undertaking.[2] Defendant was to incur no financial obligation, and plaintiff's "fee" was defendant's promise to "insure him a position" with the seller. Nor was there any guarantee with respect to this "position." It would be hoped that if the seller

---

2. Whether plaintiff adequately performed we find to have been at least a jury question. This

is not to say that defendant did not have a good faith belief that plaintiff had not.

were given plaintiff's name at the appropriate time, the seller would engage him as the, or a broker, to be paid the fee, or to share in the fee, but, if not, defendant would nevertheless have performed. Plaintiff went to the jury not for a brokerage fee, but for the found value of the promised, and lost, opportunity to obtain one.

We recognize that although the Massachusetts court has said that oral agreements for brokerage—an oral agreement being sufficient—that depart from ordinary practices are "unquestionably susceptible of misstatement and exaggeration," the court has determined as well that these concerns "go only to the weight and reliability of the testimony, matters for the jury, and to the reasonableness of the various permissible inferences to be drawn from it." *Davidson v. Robie*, 345 Mass. at 340, 187 N.E.2d at 376. On this record we agree with the district court that a directed verdict was not in order.

■ Nor do we think that appraisal of the lost opportunity to be awarded a fee by the seller was too speculative for jury consideration. In particular we reject defendant's reading of *Corleto v. Prudential Insurance Co.*, 320 Mass. 612, 70 N.E.2d 702 (1947), and *Shapiro v. Segal*, 316 Mass. 556, 55 N.E.2d 782 (1944). According to defendant, these cases express the court's judgment that *all* agreements of the form alleged by plaintiff are necessarily too speculative to warrant judicial enforcement. The brief discussion in these opinions does not justify such a broad reading, and the cases are distinguishable on their facts. In the instant case the jury had specific evidence on the amount of brokerage fees awarded generally and on the Cherry Hill sale, and the additional findings required to assess plaintiff's chances are not demonstrably more speculative than those required in many contract or tort actions. *Cf. Air Technology Corp. v. General Electric Co.*, 347 Mass. 613, 626–27, 199 N.E.2d 538, 548 (1964).

■ At the same time, we find no reversible error in the court's decision to exclude certain testimony on mitigation of damages. Defendant proffered testimony by the seller to the effect that, if plaintiff, having learned of defendant's steps toward purchasing the Cherry Hill site, approached the seller, the seller would have referred him to the broker active in the purchase, for discussion about the possible splitting of a fee. Lacking, however, was any evidence that at this late date the second broker would have voluntarily surrendered part of its fee. Especially where there was no evidence that plaintiff had contributed in any degree to defendant's interest, the second broker, engaged by the seller unreservedly in ignorance of plaintiff's "position," could hardly be expected to do so.

The motion for judgment n.o.v. was properly denied. As to the motion for a new trial, this is perhaps a thin case, and one that does nothing, when we view the record as a whole, to rebut what is suggested in *Davidson v. Robie*, ante, that oral brokerage agreements may have unanticipated tenacity. We see, however, no sufficient grounds for overruling the district court's discretion in denying the motion.

*Affirmed.*

## APPENDIX

In addition to his own testimony, we note that plaintiff's witness Pratt, president of an independent brokerage firm, testified that he telephoned Burns to interest him in a piece of property, and Burns told him that plaintiff was "representing them exclusively in their site search." On cross-examination defendant's counsel was not permitted to ask, "And in those [phone] conversations we had, didn't you tell me that it was David Sampson who used the term 'exclusive' rather than Timothy Burns?" Because this raises important points of practice, we comment upon defendant's appeal.

■ In striking the question to Pratt, the court cited Fed.R.Evid. 801(d)(1)(A) and (B), presumably for the proposition that Pratt's affirmative answer would not be admissible as substantive evidence. *Cf. Subecz v. Curtis*, 483 F.2d 263, 266 (1st

Cir.1973). However, defendant now complains that Pratt's testimony was the only affirmative evidence of Burns' using the word "exclusive" and that the question was a fair attempt to impeach by a prior inconsistent statement. *Id.* at 267 n. 2; *see also United States v. Winkle*, 587 F.2d 705, 710 (5th Cir.), *cert. denied*, 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979). Whether it was necessary to point this purpose out to the court, in view of what we would have thought readily apparent, may be debatable. *See* Fed.R.Evid. 103(a)(2); *cf. Daskarolis v. Firestone Tire & Rubber Co.*, 651 F.2d 937, 940–41 (4th Cir.1981); *Saltzman v. Fullerton Metals Co.*, 661 F.2d 647, 652–53 (7th Cir.1981); *United States v. Alden*, 476 F.2d 378, 381 (7th Cir.1973). We have recognized that counsel may hesitate to argue with the court when uninvited. *Curreri v. International Brotherhood of Teamsters*, 722 F.2d 6, 13 (1st Cir.1983). But even if defendant be regarded as having adequately objected, there is further trouble. We do not suggest that a defendant must make a post-trial motion as a matter of course to preserve its rights on appeal. Particularly we would not if the error was such that it would necessarily, if sustained, require a new trial. Where, however, the district court's ruling would call into play a discretionary matter, peculiarly appropriate for that court, it becomes more important to bring the error first to that court's attention. As we said in *Welch & Corr Construction Corp. v. Wheeler*, 470 F.2d 140, 141 (1st Cir.1972),

> Our comments should not be misconstrued as requiring the routine filing of post-judgment motions. Obviously, there are many cases—perhaps most—where it would be unrealistic to expect the district court, having decided the case, to reconsider it. However, the nature of the present complaint best lent itself to evaluation by the court which heard the evidence.

Here there is a question whether the excluded testimony would have had a substantial effect on the outcome of the trial. The district court that heard the evidence would be the best determiner of that issue.

We do not rule that defendant was obliged to file a motion for a new trial. However, it did file such a motion, addressing a number of other alleged evidentiary errors. It cannot have it both ways, raising some there, and then a new one here, claiming it a decisive point. We hold it waived.