# United States Court of Appeals

## For the First Circuit

No. 10-1312

GEMINI INVESTORS INC.,

Plaintiff, Appellant,

v.

AMERIPARK, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Lynch, Chief Judge,
Souter,[*] Associate Justice,
and Stahl, Circuit Judge.

Victor H. Polk, Jr., with whom Zachary C. Kleinsasser and Greenberg Traurig, LLP were on brief, for appellant.
Rocco E. Testani, with whom Jamala S. McFadden, Donna M. Brewer, Douglas K. Mansfield, Sutherland Asbill & Brennan LLP and Casner & Edwards LLP were on brief, for appellee.

June 23, 2011

[*]The Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**STAHL**, **Circuit Judge**.  Gemini Investors Inc. ("Gemini") sued AmeriPark, Inc. ("AmeriPark")[1] alleging breach of contract and breach of the covenant of good faith and fair dealing.  Gemini, having lost at trial, asserts that the district court erred in instructing the jury.  We affirm.

## I.  Facts & Background

AmeriPark owns and runs valet service operations at restaurants, hotels, and shopping centers across the country.  It was founded by Robert K. Patterson, who led the company until 2008.  At the time relevant to this litigation, Greenfield Partners, L.L.C. ("Greenfield") owned 24.9 percent of AmeriPark.[2]  James S. Nix was Greenfield's Vice President and AmeriPark's primary contact at Greenfield.

On January 31, 2007, AmeriPark and Mile Hi Valet Services, Inc. ("Mile Hi"), a competing valet services company, executed a letter of intent indicating that AmeriPark would acquire Mile Hi for sixteen million dollars.  Although much of the letter of intent was non-binding, the parties agreed to be bound by an

---

[1]AmeriPark's name has since been changed to "E & B Parking Services, Inc."  Consistent with the record below, we refer to the company as AmeriPark.

[2]AmeriPark's brief suggests that these shares were held by two related companies ("GreenPark Investment, L.L.C. and Greenfield Parking PL, L.L.C."), but at least some documents in the record refer to the shareholder as simply "Greenfield Partners, L.L.C." The name or names of the shareholder(s) does not impact our analysis.

exclusivity clause prohibiting Mile Hi from negotiating for its sale with anyone other than AmeriPark for a seventy-five day period.

To facilitate its purchase of Mile Hi, AmeriPark sought financing from Gemini, a private equity firm. Gemini's Managing Director, James Rich, took the lead in negotiations with AmeriPark. On March 15, 2007, AmeriPark and Gemini executed an "Outline of Key Transaction Terms" ("Outline"), which specified the terms pursuant to which Gemini would finance the Mile Hi acquisition, as well as some conditions for completion of the deal. Because the Outline contemplated a recapitalization of AmeriPark and a redemption of Greenfield's shares, AmeriPark needed Greenfield's approval to move forward with the financing as specified in the Outline.

Among other terms, the Outline included the following language: "This *Outline* does not constitute a commitment by Gemini to complete the financing and, other than the Section [sic] entitled 'Exclusivity' and 'Confidentiality', is non-binding on either party hereto." That is, the only terms of the Outline that bound Gemini and AmeriPark were the exclusivity and confidentiality provisions.

The exclusivity provision read:

> In consideration of Gemini's commitment to expend significant time, effort and expense to evaluate the possible investment, AmeriPark (and any officers, directors or representatives of AmeriPark) agrees not to discuss this opportunity or reach any

-3-

> agreement with any person or entity regarding
> financing for this Transaction or the pursuit
> of any sale or major other financing until
> April 16, 2007, provided that the exclusivity
> shall be automatically extended to the date
> that Mile Hi extends their exclusivity with
> [AmeriPark] either verbally or in writing.

(Emphasis added). The confidentiality provision read:

> This *Outline* is delivered to you with the
> understanding that neither it nor its
> substance shall be disclosed by you to any
> third party except those in a confidential
> relationship with [AmeriPark] such as
> directors, senior executive officers, legal
> counsel and accountants. **Disclosure to
> investment banking firms, mezzanine, venture
> capital or private equity funds or any other
> individual investors is strictly prohibited**.

(Emphasis in original).

Importantly, as indicated in the above-quoted language, the Outline's exclusivity period was essentially coterminous with the exclusivity period created by the AmeriPark-Mile Hi letter of intent. Consequently, when Mile Hi later agreed to an extension of the letter of intent's exclusivity period, the Outline's exclusivity automatically extended as well.

In April 2007, after the parties signed the Outline but before the exclusivity provision expired, Patterson asked Nix if Greenfield would be interested in financing the Mile Hi acquisition in lieu of the Gemini-led financing.[3] Also during this period,

---

[3]As work on the Mile Hi acquisition progressed, Patterson began to distrust Rich and Gemini, and he therefore sought alternative financing sources.

-4-

Patterson approached Robert Stroup, the Chief Executive Officer and sole shareholder of Mile Hi, about the possibility of seller financing. After some negotiation, Stroup agreed to finance the acquisition and, on May 4, 2007, AmeriPark purchased Mile Hi using this seller financing.

On June 25, 2007, Gemini sued AmeriPark in Massachusetts Superior Court alleging that AmeriPark breached the Outline's exclusivity provision by pursuing financing for the Mile Hi acquisition from both Greenfield and Stroup. The suit was removed to federal court, and eventually went to trial.[4]

At trial, the parties had competing views about the meaning of the exclusivity provision. AmeriPark argued that the phrase "any person or entity" referred to the persons or entities expressly set forth in the confidentiality provision — investment banks, private equity funds, etc. — and therefore AmeriPark's financing-related discussions with Greenfield and Stroup did not constitute a breach of AmeriPark's contractual obligations. Gemini, on the other hand, contended that the exclusivity provision was unambiguous and prohibited discussions with "any person or entity," including Greenfield and Stroup. Accordingly, Gemini requested the following jury instruction: "Under the Exclusivity agreement, AmeriPark agreed not to discuss with any person or

_____

[4]AmeriPark unsuccessfully counterclaimed against Gemini. Neither party raises any issues relating to those counterclaims.

entity the proposed transaction with Mile Hi or to reach any agreement with any person or entity regarding any major financing until the exclusivity period expired."

Over Gemini's objection, the district court concluded that the exclusivity provision was ambiguous and instructed the jury about its meaning in part as follows:

> [Y]ou've got to look at the language of the exclusivity provision. . . . [Y]ou've got to figure out what does that private law require each party . . . to do. . . .
>
> You use the plain and ordinary meaning of the words that the parties used, having in mind the commercial context. . . . Having in mind what the parties, what their commercial goals were, what did they have in mind when they entered into this deal, so that you can understand what the language they put down in that exclusivity agreement means. . . .
>
> I'm telling you that the law is that if the plain and ordinary meaning of the words that they used tell [sic] us how they should have behaved, you follow that. . . . That's what they put down in a contract. What they say about it afterwards doesn't count.
>
> Now, if you are not clear on the point, if you think that there's any ambiguity in those words, start with this. What were they trying to do. . . . And while what they think later may bear on that, its not what they think later, it bears only to tell you what they thought they were doing when they agreed.

Later in the instructions, the district court further clarified: "you're going to interpret the contract, which means you're going to decide what it requires[.]"

-6-

As for causation and damages, Gemini argued that the Mile Hi acquisition would have occurred with Gemini's financing but for AmeriPark's breach of the exclusivity provision, and therefore Gemini was entitled to expectation damages for the profits it would have realized had the deal been completed. As an alternative theory of causation and damages, Gemini, citing Air Technology Corp. v. General Electric Co., 199 N.E.2d 538 (Mass. 1964), urged the district court to instruct the jury on what Gemini called a "lost opportunity" theory. Specifically, Gemini argued that, even if it could not prove by a preponderance that AmeriPark's breach was the but for cause of the Gemini-financed deal falling through, the jury could still award damages for Gemini's "lost . . . opportunity to negotiate" with AmeriPark to finance the deal. This "lost opportunity," Gemini claimed, could be calculated by assessing the value of the transaction to Gemini had it gone forward, and then decreasing that value based on the possibility that the deal would have fallen through for some reason other than AmeriPark's breach.

The district court refused to issue Gemini's "lost opportunity" instructions.[5] Instead, it instructed the jury on causation and expectation damages in part as follows:

> Gemini, since they [sic] want the benefit of the bargain, they've [sic] got to

---

[5]Gemini did not request reliance damages for the expenditures it made in reliance on the exclusivity clause.

prove that but for the breach this deal would in fact have gone through and they would have made money. . . .

A reasonable approximation [of damages] will suffice, but its got to be proved by a fair preponderance of the evidence.

This is largely a matter of judgment committed to the jury taking into account relevant factors, including what you conclude would have been the approximate net amount realized by Gemini from the deal going through.

After closing, the district court gave the jury a general verdict form, despite AmeriPark's previous request for a special verdict. During deliberations, the jury asked the following question: "Please redefine Question No. 4. Did breach cause Gemini losses? Do we assume [sic] contract would have gone through if it was not breached?" The district court responded by essentially reiterating its causation instruction and stressing that it was for the jury to determine if the breach caused the deal to collapse. Later that same day, the jury returned a verdict in favor of AmeriPark.

## II. Discussion

Gemini essentially raises two issues on appeal.[6] First, did the district court err by refusing to instruct the jury on

---

[6]Gemini's brief lists four issues, but the first three all go to the propriety of the district court's failure to instruct on Gemini's lost opportunity theory.

Gemini's "lost opportunity"[7] theory of causation and damages? Second, did the district court err in its instruction to the jury about the meaning of the exclusivity provision?

This court reviews jury instructions de novo. SEC v. Happ, 392 F.3d 12, 28 (1st Cir. 2004). Where an objection is properly registered below,[8] jury instructions are "reviewed to see whether there was error and, if so, whether [that error] was harmless." Sheek v. Asia Badger, Inc., 235 F.3d 687, 697 (1st Cir. 2000). "We reverse the giving of an instruction 'if it (1) was misleading, unduly complicating, or incorrect as a matter of law, and (2) adversely affected the objecting party's substantial rights.'" Happ, 392 F.3d at 28 (quoting Sheek, 235 F.3d at 697). Similarly, "'refusal to give a particular instruction constitutes reversible error only if the requested instruction was (1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point

---

[7]Throughout our analysis, we refer to the "lost opportunity theory" and "lost opportunity damages." Courts have used similar language to describe various concepts. We use these phrases to refer only to the lost opportunity approach that Gemini urges this court to apply in the case at hand.

[8]AmeriPark argues that because Gemini requested a but for instruction, it "invited any alleged error" in the causation instructions and at the least Gemini's challenge to the causation instructions should be subject to plain error review. Because we find no error in the instructions, see infra, we need not address these arguments.

in the case.'"[9]   Seahorse Marine Supplies, Inc. v. P.R. Sun Oil Co., 295 F.3d 68, 76 (1st Cir. 2003).

## 1.  The District Court's Failure to Instruct on Gemini's "Lost Opportunity" Theory

Under Massachusetts law,[10] to recover expectation damages for breach of contract the plaintiff must prove by a preponderance that an agreement existed, the agreement was breached, and the breach caused the plaintiff to suffer damages. See St. Charles v. Kender, 646 N.E.2d 411, 413 (Mass. App. Ct. 1995); see also Salvas v. Wal-Mart Stores, Inc., 893 N.E.2d 1187, 1216 (Mass. 2008) ("'Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed[.]'" (quoting Restatement (Second) of Contracts § 347, cmt. a (1981))); Abrams v. Reynolds Metals Co., 166 N.E.2d 204, 207 (Mass. 1960) ("Damages may be awarded for a

---

[9]At oral argument, we asked the parties to submit supplemental briefing about the effect of a general verdict on Gemini's challenge to the jury instructions. AmeriPark and Gemini seem to agree that the fact that a general verdict was entered will not prevent an improper instruction from resulting in a new trial unless this court can be reasonably sure that the jury relied on an alternative, permissible basis in reaching its verdict. See Gillespie v. Sears, Roebuck & Co., 386 F.3d 21, 29-31 (1st Cir. 2004); Davis v. Rennie, 264 F.3d 86, 105-06 (1st Cir. 2001). Because we reject Gemini's contention that the instructions were flawed, we need not delve into this issue.

[10]Both parties agree that Massachusetts law applies to this diversity action.

breach of contract for the net amount of the losses caused and gains prevented by the defendant's breach." (internal citations omitted)); Schwartz v. Travelers Indem. Co., 740 N.E.2d 1039, 1047 (Mass. App. Ct. 2001) (noting that a claim of breach of an implied contract will not go to the jury without "any evidence supporting an inference that the harm which befell [plaintiff] followed as a natural consequence of the breach." (internal marks omitted)).

The causation element generally requires the plaintiff to prove that but for the defendant's breach the plaintiff would have realized some gain or avoided some loss.[11]  See Taylor v. Int'l Indus., Inc., 398 N.E.2d 501, 503 (Mass. App. Ct. 1979).

Gemini does not dispute the fact that but for causation is usually a prerequisite to recovering expectation damages. Nonetheless, Gemini appeals the district court's failure to instruct the jury on its alternative "lost opportunity" approach to causation and damages.  Specifically, Gemini asserts that, pursuant to the Massachusetts Supreme Judicial Court's ("SJC") holding in Air Technology, "[t]he district court should have instructed the jury that Gemini could show that it was harmed by proving that AmeriPark's breach caused it to lose the exclusive opportunity to

---

[11]AmeriPark suggests that the breach of a binding exclusivity agreement in a non-binding letter of intent can never result in lost profit damages because it is not reasonably foreseeable that such a breach could cause a deal to fall through.  Because we reject Gemini's challenge to the district court's instructions, we need not address this argument.

negotiate a final contract with AmeriPark." Under this approach, Gemini contends that "the jury should have been instructed that it could determine the value of Gemini's lost opportunity by discounting [Gemini's] expected profit from the potential transaction with AmeriPark by the uncertainty that a final agreement would have been reached."[12]

Air Technology's holding and facts are confusing, but we recount them here as clearly and succinctly as possible.[13] In the early 1960s, the General Electric Company ("GE") sought a contract from the Air Force to assist with the "establish[ment] [of] installations in North America for detecting and determining the direction and yield of nuclear detonations by methods including the use of electromagnetic (EM) sensors." Air Tech., 199 N.E.2d at 540. To bolster its efforts, GE considered assistance from Air Technology Corporation ("AT"). Id. at 541. In a meeting between representatives of the two companies, AT proposed a system "for the EM sensor portion of the [Air Force project]." Id. Eventually, GE

_____

[12]It is unclear whether Gemini seeks to apply this lost opportunity approach to its claim for breach of the covenant of good faith and fair dealing in addition to its breach of contract claim. Regardless, even if Gemini's appeal is understood as arguing for the theory's application to both claims, it would not materially change our analysis.

[13]Although the agreement in Air Technology was governed by New York law, the SJC cited to Massachusetts case law throughout the opinion and noted that "[i]t is not argued that the Massachusetts law and the New York law differ substantially in relevant respects." 199 N.E.2d at 546 n.13.

and AT agreed that AT would become a "team member" on GE's bid. Id. at 547. "Team membership," the SJC concluded, "was intended to mean more to AT than opportunity to bid in the program"; rather, "if [GE] received a prime contract AT[,] subject to Air Force approval[,] would receive a subcontract for the EM sensor[.]" Id. (internal marks omitted). Thereafter, AT personnel helped GE prepare and present its proposal to the Air Force. Id. at 541-43.

The Air Force subsequently awarded the prime contract to GE. Id. at 543. Among other things, this contract required that all GE subcontracts receive Air Force approval. Id. at 544. To AT's dismay, GE refused to acknowledge its obligation to award a subcontract to AT for the design and manufacture of the EM sensor, and instead sought competitive bids for the job. Id. at 544-45.

The SJC held that "GE, by failing to press for AT's continuing participation in the program and by competing for the EM sensor work, committed total breaches of its duties to AT." Id. at 548-49. As for damages, the SJC remanded for a determination of the value of AT's lost opportunity, id. at 548-50, explaining:

> [T]he detailed terms of AT's subcontract were never determined beyond the expectation that the subcontract would cover the EM sensor and enable AT to recover its costs and a reasonable profit. Whatever uncertainty may have existed about the subcontract does not preclude recovery by AT. What AT lost by GE's breaches of contract was a business opportunity. The problem is to determine the value of that opportunity . . . .

-13-

Id. at 548 (internal citations omitted).  The SJC rejected the master's decision to use AT's subcontract proposals to measure damages in part because

> the master's computation of damages seems to have been made by allowing to AT the whole of what it would have received . . . on the basis of its bids, less the cost to AT of performing such a subcontract.  That computation did not in any degree reflect the potential effect . . . of bargaining or the possibility that the Air Force would not have approved such a subcontract without competition.

Id. at 549 (internal citation omitted).

> The court therefore concluded:

> The master or a judge . . . must appraise the fair value of AT's lost opportunity in the light of the uncertainties.  This will be largely a matter of judgment, taking into account relevant factors, including what the trier of the fact concludes would have been (1) the approximate net amount realized by AT from a subcontract, if one had been negotiated, and (2) the probability of successful negotiations and Air Force approval.

Id. (internal citation omitted); see also Miller v. Allstate Ins. Co., 573 So. 2d 24, 29 (Fla. Dist. Ct. App. 1990) (in approving a similar damages theory, concluding "that recovery will be allowed where a plaintiff has been deprived of an opportunity or chance to gain an award or profit even where damages are uncertain"); Wachtel v. Nat'l Alfalfa Journal Co., 176 N.W. 801, 802-05 (Iowa 1920) (where defendant breached contract by restricting plaintiff's ability to compete in contest in which she was likely to win a

-14-

prize, holding that defendant could be held liable for the plaintiff's lost chance of winning a prize). But see Wright v. St. Mary's Med. Ctr. of Evansville, Inc., 59 F. Supp. 2d 794, 799 (S.D. Ind. 1999) (rejecting loss of chance theory because, among other reasons, Indiana had rejected a similar doctrine in medical malpractice cases and "[t]here is less basis for denying recovery for loss of a chance in tort cases [as compared to contract cases]")[14]; Phillips v. Pantages Theatre Co., 300 P. 1048, 1049-50 (Wash. 1931) (where court assumed that defendant breached contractual duty to allow plaintiff to enter final round of contest, affirming dismissal because "[w]ithout either the winning . . . or substantial proof that she would have won had she been permitted to enter, no recovery can be had").

In Sampson v. Eaton Corp., 809 F.2d 156 (1st Cir. 1987), the defendant and Sampson had agreed that Sampson would serve as the defendant's exclusive real estate agent as the defendant sought to purchase property in Massachusetts. Id. at 159. Although industry norms dictated that the seller was to pay the agent's brokerage fee, the agreement obligated the defendant to inform the seller of Sampson's position if the defendant ended up acquiring a property that Sampson had showed. See id. The defendant was under

---

[14]In medical malpractice cases, Indiana now appears to have embraced an approach similar to, if not the same as, the loss of chance doctrine. See Cahoon v. Cummings, 734 N.E.2d 535 (Ind. 2000).

no obligation, however, to ensure that the seller actually paid Sampson the fee.  <u>Id.</u>  The defendant ended up purchasing a property, but never informed the seller about Sampson, and the seller paid the fee to a different agent.  <u>Id.</u> at 157-58.  Because the contract lacked a guarantee that Sampson would receive any payment, Sampson "went to the jury not for a brokerage fee, but for the found value of the promised, and lost, opportunity to obtain one."  <u>Id.</u> at 160.  The jury awarded Sampson one-half the value of the fee, <u>id.</u> at 157, and this court concluded that those damages were not too speculative.  <u>Id.</u> at 160.  Citing <u>Air Technology</u>, the court observed, "the jury had specific evidence on the amount of brokerage fees awarded generally and on the [specific sale at issue], and the additional findings required to assess plaintiff's chances are not demonstrably more speculative than those required in many contract or tort actions."  <u>Id.</u>

We do not think the lost opportunity theory of causation and damages urged by Gemini is applicable to the case before us. First, the Gemini-AmeriPark contractual agreement is distinguishable from the agreement in <u>Air Technology</u>.  In <u>Air Technology</u>, GE was obliged to award AT a subcontract if GE secured the prime contract, provided that the parties were able to agree on specific terms and obtain Air Force approval for the subcontract. In the case at hand, AmeriPark lacked any analogous contractual duty; rather, at best, AmeriPark's obligation was merely to refrain

from discussing, negotiating for, or obtaining financing from third parties. To be sure, this exclusivity provision was presumably drafted to pressure AmeriPark into accepting financing from Gemini if it moved forward with the Mile Hi acquisition. But there is a meaningful difference between a duty to award a subcontract, albeit subject to certain conditions, and a duty to refrain from dealing with third parties. Even if Air Technology holds that a breach of the former duty can cause the type of lost opportunity injury asserted by Gemini, it does not necessarily follow that a breach of the latter duty does as well. Put differently, in Air Technology the plaintiff actually lost a contractually guaranteed right to a subcontract (subject to certain conditions); in the case at bar, Gemini was at best deprived of a contractually guaranteed right to exclude others from negotiating with AmeriPark.

Nor do we see any indication that Massachusetts has extended the interpretation of Air Technology urged by Gemini beyond the circumstances of that case. Massachusetts is of course free to do so, but we are not in a position to take that step for it. See Noonan v. Staples, Inc., 556 F.3d 20, 30 (1st Cir. 2009) (acknowledging this court's obligation to provide its "best guess" as to open questions of state law, but "recogniz[ing] that . . . we must tread lightly in offering interpretations of state law where controlling precedent is scarce"); Gill v. Gulfstream Park Racing Ass'n, 399 F.3d 391, 402 (1st Cir. 2005) ("A federal court sitting

-17-

in diversity cannot be expected to create new doctrines expanding state law.").

Because we conclude that Gemini's lost opportunity theory of causation and damages does not apply in this case, the district court did not err in refusing to issue the corresponding jury instruction.

## 2. The District Court's Instruction Regarding the Meaning of the Exclusivity Provision

Gemini contends that the district court erred in concluding that the exclusivity provision was ambiguous and in instructing the jury accordingly. This objection goes to the logically prior question of whether the jury was correctly instructed on the core question of whether there was a breach of contract at all.[15] Specifically, Gemini argues that the phrase "any person or entity" is unambiguous, and that the jurors should not have been given instructions that allowed them to conclude that Stroup and Greenfield did not fit the definition of "any person or entity."

"Ordinarily, in Massachusetts 'contract interpretation is for the court, unless disputed issues of fact bear upon the interpretation of ambiguous language.'" Kunelius v. Town of Stow, 588 F.3d 1, 10 (1st Cir. 2009) (quoting Liberty Mut. Ins. Co. v.

---

[15]It is possible the jury found there was no breach and did not reach the causation and damages question. Because there was a general verdict, we do not know.

-18-

<u>Greenwich Ins. Co.</u>, 417 F.3d 193, 197 (1st Cir. 2005)).  "A term is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one."  <u>Citation Ins. Co.</u> v. <u>Gomez</u>, 688 N.E.2d 951, 953 (Mass. 1998); <u>see</u> <u>also</u> <u>Lanier Prof'l Servs., Inc.</u> v. <u>Ricci</u>, 192 F.3d 1, 4 (1st Cir. 1999).  Even if the meaning of a term is clear by itself, it "may be ambiguous when read in the context of the entire . . . contract, or as applied to the subject matter."  <u>Jefferson Ins. Co. of N.Y.</u> v. <u>City of Holyoke</u>, 503 N.E.2d 474, 477 (Mass. App. Ct. 1987).

The district court did not err in concluding that the exclusivity provision was ambiguous.  The relevant language read as follows: "AmeriPark (and any officers, directors or representatives of AmeriPark) agrees not to discuss this opportunity or reach any agreement with any person or entity regarding financing for this Transaction or the pursuit of any sale or major financing . . . ."  As AmeriPark points out, a literal reading of this language precludes AmeriPark from "discuss[ing] this opportunity . . . with any person or entity regarding financing for this Transaction."  The Outline did not define "person or entity," however, and it implicitly contemplated that AmeriPark would in fact "discuss" the acquisition's financing with other "person[s] or entit[ies]."[16]

---

[16]For example, the confidentiality provision permitted AmeriPark to disclose the contents of the Outline to "those in a confidential relationship with [AmeriPark] such as directors,

Consequently, "reasonably intelligent persons" could disagree about what or who qualified as a "person or entity."  The district court therefore correctly concluded that the terms were ambiguous, and it did not err in instructing the jury accordingly.

### III.  Conclusion

For the reasons explained above, we affirm.

---

senior executive officers, legal counsel and accountants." Moreover, the non-binding provisions of the Outline contemplated that part of the financing would be used to repurchase Greenfield's equity position in AmeriPark, which presumably would require some discussion of the financing with Greenfield.