# United States Court of Appeals
## For the First Circuit

No. 12-1218

THE ESTATE OF ÁNGEL BERGANZO-COLÓN REPRESENTED BY EFRAÍN
AND RUBÉN BERGANZO; THE ESTATE OF ANTONIO RODRÍGUEZ-MORALES
REPRESENTED BY NOEMÍ RODRÍGUEZ-ROBLES, ELIEZER RODRÍGUEZ-ROBLES,
ÁNGEL M. RODRÍGUEZ-ROBLES, MARÍA M. RODRÍGUEZ-ROBLES AND
RUTH D. RODRÍGUEZ-ROBLES,

Plaintiffs, Appellees,

v.

JOSHUA M. AMBUSH,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, U.S. District Judge]

Before

Howard, Lipez and Thompson,
Circuit Judges.

Raúl M. Arias, with whom McConnell Valdes LLC was on brief,
for appellant.
David Efron, with whom Joanne V. Gonzales Varon and Law
Offices of David Efron, P.C. were on brief, for appellees.

January 7, 2013

**HOWARD**, **Circuit Judge**.  Joshua M. Ambush, an attorney, appeals various judgments and orders of the United States District Court for the District of Puerto Rico, which nullified two retainer agreements signed by Ambush's clients.  The district court issued its final judgment after a jury found that Ambush had secured his clients' consent to the retainer agreements by deceit.  We affirm.

## I. Background

In 1972, Japanese terrorists opened fire on a group of Puerto Ricans at Lod Airport in Tel Aviv, Israel, killing several of them.  Among those killed were Ángel Berganzo-Colón and Antonio Rodríguez-Morales, whose heirs are the appellees in this case.  At the time, sovereign immunity generally prevented a victim of terrorism (or his heirs) from filing suit in the United States courts against a nation that sponsored the terrorist act.  In 1996, however, Congress created a "terrorism exception" to sovereign immunity.  Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 221(a)(1)(C), 110 Stat. 1214, 1241 (repealed 2008).  For acts of terrorism that occurred before the law was enacted, plaintiffs had ten years to file suit.  Id. § 221(a)(2).

In the early 2000s, Ambush was a new attorney in Maryland with an interest in cases relating to international terrorism.  Ambush's research led him to believe that Libya and Syria had sponsored the Lod Airport massacre, and he thought that he could bring suit against those nations if he could find the right

plaintiffs. He took his idea to an organization called the American Center for Civil Justice (the "Center"), which sponsored litigation by victims of terrorism. Ambush had become familiar with the Center through his family friend Eliezer Perr, who was one of the Center's principals. The Center agreed to participate, and Ambush found potential plaintiffs, including the appellees, with the help of his Puerto Rican cousin Leopoldo García-Viera.

In 2002, García had potential plaintiffs sign a "Claimant and Center Agreement," under which the Center would cover all costs of investigating and litigating their cases in return for twenty percent of any proceeds from litigation. They also signed a power of attorney in favor of Michael Engelberg, the director of the Center. The Claimant and Center Agreement was not a retainer agreement, but it did obligate the Center to secure counsel to commence litigation. It did not mention Ambush. Ambush, who does not speak Spanish, did not travel to Puerto Rico or meet with the signatories.

Over the next few years, Ambush and the Center unsuccessfully attempted to persuade a major law firm to litigate against Libya and Syria. Faced with the impending expiration of the ten-year statute of limitations, the Center asked Ambush to draft and file a complaint, which he did in April 2006. Without assistance from other attorneys, Ambush began to litigate the case, known as <u>Franqui</u> v. <u>Syrian Arab Republic</u>, No. 1:06-cv-00734-RBW

-3-

(D.D.C. filed Apr. 21, 2006). He effected service on the defendants and opposed motions to dismiss. During this time, Ambush had no written agreement with the Center regarding compensation for his work on the Franqui litigation. From time to time, he would ask the Center for payment at the rate of fifty dollars per hour, as well as reimbursement for his expenses. The Center made some payments to Ambush, but the Center and Ambush dispute whether he was paid in full. Engelberg believed that Ambush had been paid everything he was owed. Ambush believed that he had an oral understanding with Eliezer Perr that he would receive a substantial percentage of any recovery.

In August 2008, as the Franqui litigation progressed, the United States and Libya signed a settlement agreement that foreclosed terrorism-related suits against Libya. In exchange, Libya would compensate victims of terrorist acts it sponsored, by contributing to a settlement fund to be administered by the United States Department of State. The fund would pay $10 million to the estate of each person killed in an act of Libyan-sponsored terrorism.

After the Libyan settlement was announced, the Center sent Ambush a letter telling him to turn his case file over to Paul Gaston, an attorney whom the Center had hired and who had filed a notice of appearance in the Franqui litigation a few months before.

Ambush did not turn over his file, but instead went to Puerto Rico to meet with the Franqui plaintiffs for the first time.

On December 15, 2008, Ambush, along with his cousin García and a notary public, met with the families of Ángel Berganzo and Antonio Rodríguez. Berganzo had two heirs: Efraín and Rubén Berganzo-Cruz. Only Efraín attended the meeting. Rodríguez had five heirs: Noemí, Eliezer, María, Ángel, and Ruth Rodríguez-Robles. All but Ruth attended the meeting. What was said at the meeting is a matter of dispute that we will discuss below. But it is undisputed that all of the heirs present at the meeting signed retainer agreements--one for each estate--that revoked Engelberg's power of attorney, retroactively retained Ambush as the heirs' counsel for the Franqui litigation and the administration of their claims in the Libyan settlement, and awarded Ambush ten percent of any recovery. Rubén Berganzo did not sign the retainer agreement, but he testified that his brother Efraín signed on his behalf under a power of attorney. Ruth Rodríguez signed the retainer agreement a week later in Florida. Two days after the meeting, Ambush sent a letter to Engelberg informing him that his power of attorney was revoked and telling him not to contact the plaintiffs in the Franqui litigation.

Ambush then worked to obtain settlement funds for the Franqui plaintiffs. He dismissed the Franqui litigation as the settlement agreement required, and he gathered the documents that

-5-

the State Department requested. By April 2009, the State Department paid $10 million to Ambush's trust account for each of the two estates. Of this $10 million, Ambush sent $2 million to the Center pursuant to the Claimant and Center Agreements, kept $1 million pursuant to the retainer agreements, and sent $7 million to the heirs.

As one might expect, relations between Ambush and the Center soured. The Center filed suit against Ambush, alleging that he breached his fiduciary duty to the Center by convincing the Franqui plaintiffs to revoke Engelberg's power of attorney, and that he deliberately performed his work inefficiently and overcharged the Center. See Am. Ctr. for Civil Justice v. Ambush, No. 1:09-cv-00233-PLF (D.D.C. filed Feb. 6, 2009). Ambush counterclaimed for breach of contract, alleging that the Center had failed to pay him $2 million that it had promised as compensation for his work on the Franqui litigation.

While Ambush and the Center litigated against each other, the Center hired a Puerto Rico attorney, Javier López-Pérez, to run the following advertisement in the Puerto Rican press directed specifically toward the Franqui plaintiffs:

> You could be the object of a scheme of improper collection of attorneys fees by attorneys in Washington and Maryland. If you are a party to the settlement that was reached with the Government of Libya and have been approached by attorneys from outside who propose new agreements for the payment of

-6-

> additional fees, please communicate with us immediately.
>
> > You do not have to pay any more than what was originally agreed.

López also was quoted extensively in a newspaper article titled "Victims of Lod Massacre 'Deceived.'" The heirs of Ángel Berganzo and Antonio Rodríguez contacted López, who ultimately filed this action against Ambush in the United States District Court for the District of Puerto Rico.

The heirs alleged that the retainer agreements were void because Ambush secured their consent by deceit, known in Spanish as dolo. Puerto Rico contract law provides that "[c]onsent given by . . . deceit shall be void." P.R. Laws Ann. tit. 31, § 3404. "There is deceit when by words or insidious machinations on the part of one of the contracting parties the other is induced to execute a contract which without them he would not have made." Id. § 3408. According to the heirs' complaint, Ambush failed to disclose at their meeting that the Center had paid him for his work, falsely told them that the Center had done nothing on the estates' behalf, and misrepresented that the estates' compensation was contingent on the heirs' signature of the retainer agreements.

At trial, both of Berganzo's heirs testified, as did three of Rodríguez's five heirs: Noemí, Eliezer, and María Rodríguez. Ángel and Ruth Rodríguez did not testify. Engelberg, the director of the Center, also testified for the heirs. Both

sides called Ambush as a witness, and Ambush called García, who was present at Ambush's meeting with the heirs. At the close of the heirs' case and again at the close of Ambush's case, the court denied motions by Ambush to dismiss the heirs' dolo claim as a matter of law under Rule 50 of the Federal Rules of Civil Procedure.

The jury returned a verdict against Ambush, deciding that he had committed dolo against all seven heirs, and it awarded $100,000 in additional damages to each of the five heirs who testified at trial. The court entered a judgment nullifying the retainer agreements and ordered Ambush to pay $1 million in restitution to each of the two estates. Ambush then filed a post-trial motion for judgment as a matter of law or for a new trial. In addition, Ambush moved for remittur of the $100,000 of additional damages for each testifying heir. The court denied the motion for judgment as a matter of law or for a new trial, but it remitted the additional damages to $5,000 for each testifying heir. Ambush timely appealed the denials of his motions for judgment as a matter of law and for a new trial.

## II. Analysis

Ambush appeals on three grounds, each of which he raised at trial and in his post-trial motions. First, there was insufficient evidence to justify the jury's finding of dolo. Second, the jury should not have been allowed to find dolo with

respect to the two heirs who did not testify. Third, the court erred by instructing the jury on just one of the two types of dolo described in the Puerto Rico Civil Code.

We review a denial of a motion for judgment as a matter of law de novo, examining the evidence and reasonable inferences therefrom in the light most favorable to the nonmovant (here, the heirs). Casillas-Díaz v. Palau, 463 F.3d 77, 80-81 (1st Cir. 2006). "A party seeking to overturn a jury verdict faces an uphill battle. 'Courts may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party.'" Marcano Rivera v. Turabo Med. Ctr. P'ship, 415 F.3d 162, 167 (1st Cir. 2005) (quoting Rivera Castillo v. Autokirey, Inc., 379 F.3d 4, 9 (1st Cir. 2004)). Our review "is weighted toward preservation of the jury verdict." Crowe v. Bolduc, 334 F.3d 124, 134 (1st Cir. 2003).

We review a denial of a motion for a new trial for abuse of discretion. Goulet v. New Penn Motor Express, Inc., 512 F.3d 34, 44 (1st Cir. 2008). "A district court should grant a motion for a new trial only if 'the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice.'" Id. (quoting Ramos v. Davis & Geck, Inc., 167 F.3d 727, 731 (1st Cir. 1999)).

### A. Sufficiency of the Evidence Regarding Dolo

At trial, the jury determined that the heirs had proven, by clear and convincing evidence,[1] that Ambush committed dolo against all of them. Ambush argues that the evidence was insufficient to support the jury's verdict. To prove dolo, a plaintiff must establish "(1) the intent to defraud; (2) reliance on the fraudulent acts; (3) the false representations used to consummate the fraud; and (4) that the fraud was consummated by virtue of such representations." P.R. Elec. Power Auth. v. Action Refund, 472 F. Supp. 2d 133, 138-39 (D.P.R. 2006). The parties' dispute begins with the third element: whether Ambush made false representations to the heirs. We will review the testimony regarding some of the alleged misrepresentations.

The heirs allege that Ambush falsely represented that if they did not sign the retainer agreements, disbursement of the settlement funds would be delayed. This allegation rests on the testimony of Efraín Berganzo and Eliezer Rodríguez.

---

[1] At the beginning of the trial, the court instructed the jury that a plaintiff must prove dolo by clear and convincing evidence. On the second-to-last day of testimony, after nearly all the witnesses had testified, we issued an opinion holding that dolo must be proven only by a preponderance of the evidence. Portugues-Santana v. Rekomdiv Int'l, 657 F.3d 56 (1st Cir. 2011). The district court decided that Rekomdiv did not apply retroactively, and that the jury would continue to be instructed on the clear-and-convincing standard. Estate of Colón v. Ambush, Civ. No. 10-01044 (GAG), 2011 WL 4543431, at *1 (D.P.R. Sept. 29, 2011). On appeal, the heirs describe the clear-and-convincing standard in passing as "inapplicable," but they do not argue that the court's decision was erroneous.

-10-

Efraín Berganzo stated the following on direct examination (via an interpreter):

> Q. Do you know what would happen if you wouldn't sign that document?
>
> A. This is the document of legal representation. Without it the case wouldn't be processed.
>
> Q. What do you mean when you say "no se podia salir el caso"?
>
> . . . .
>
> A. . . . . That the case wouldn't be able to be processed if I didn't sign this document.
>
> Q. What would that mean? If the case would not have been processed, what would have happened in your mind?
>
> A. The claim wouldn't have had any value and I wouldn't have gotten any money.

Berganzo also testified that Ambush, García, or the notary public (or more than one of them) "told me that if I didn't sign the document, they wouldn't be able to process my complaint."

On cross-examination, Berganzo appeared to recant his testimony:

> Q. . . . [B]efore you executed the retainer agreement, did Mr. Ambush ever say that if you did not sign that agreement he would stop representing you?
>
> A. Negative.
>
> Q. And by that you mean he did not say that?
>
> A. That's correct.

Q. And Mr. Ambush did not say either that if you did not sign that agreement you would not receive the payment that your estate was entitled to, right?

A. That is correct.

On redirect, however, the heirs' counsel drew a distinction between statements by Ambush and statements by García and the notary public:

Q. . . . . [You testified on cross-examination] that Ambush did not say that he would quit; did Ambush say anything? Does Ambush speak Spanish?

A. Negative.

Q. Did anybody say that Ambush would quit the case if you didn't sign the retainer?

A. That it would not be processed.

This testimony, viewed in the light most favorable to the heirs, supports a conclusion that while Ambush may not have told Bergonzo directly that he would quit the case, he conveyed this message through García or the notary public.

Eliezer Rodríguez gave similar testimony in his direct examination:

Q. What do you understand would have happened if you would not have signed the document?

. . . .

A. Well, if I didn't sign, if I didn't sign it then maybe I wouldn't have received the compensation.

Rodríguez's testimony on cross-examination was consistent:

Q. Have you seen any documents that establish that the Center has paid Mr. Ambush?

A. Well, I mean, that since we received the amount, I imagine he must have collected, I don't know.

Q. But you don't know?

A. Yes. Yes, he was supposed to have gotten paid because otherwise they wouldn't have given us the money.

Ambush denied that he had made such representations. In our view, a reasonable jury could have resolved this dispute in favor of the heirs and determined that Ambush misrepresented that the heirs risked delay or worse if they did not sign the retainer agreements. See Aponte-Rivera v. DHL Solutions (USA) Inc., 650 F.3d 803, 809 (1st Cir. 2011) ("It was the jury's role to determine witness credibility . . . . This case does not present a situation in which the evidence so strongly and overwhelmingly supports [the defendant's] position that we should disturb the jury's verdict." (internal quotation marks omitted)).

Some of the heirs also testified that Ambush told them that he would be paid his ten percent fee under the retainer agreements only if the Center did not pay him. Such a representation would have been false because the retainer agreements entitled Ambush to his fee regardless of whether the Center paid him as well. On direct examination, Noemí Rodríguez testified as follows: "Q. What were the documents for? A. It was a document to sign for 10 percent in case they were not paid at

-13-

the Center then they could not collect it from there." On cross-examination, she maintained this account of the meeting:

> Q. Now, you also told us during your direct examination that you understood that when you signed . . . the retainer agreement with Mr. Ambush, that Mr. Ambush would only collect that . . . 10 percent . . . if he was not paid by the Center, correct?
>
> A. That's what he said.
>
> Q. And you signed it because you understood that 10 percent would be a reasonable amount to pay Mr. Ambush if the Center did not pay him, correct?
>
> A. If the Center didn't pay him, yes.

She also implied that other heirs relied on this representation when signing: "A. Well, we signed because he told us that if the Center didn't pay him then he would charge us that 10 percent, if the Center didn't pay him." She admitted that the retainer agreements themselves did not put this condition on Ambush's compensation, but she was adamant that Ambush had said otherwise:

> Q. But, Ms. Rodriguez, you have just looked through [the retainer agreement] and you can't find any language saying that the 10 percent would be paid only if the Center didn't pay Mr. Ambush, correct?
>
> A. Yes, because he said it verbally to us. He explained to us that if he was paid the 20 percent from [the Claimant and Center Agreements signed in] 2002, if he was paid the 20 percent, then he would not be charging us the 10 percent.

Eliezer Rodríguez corroborated this testimony on direct examination: "Q. Do you know why Mr. Ambush had asked for 10

-14-

percent of the compensation?  A.  Well, he asked for 10 percent in case the Center didn't pay him the 20 percent, something like that."  Although he admitted on cross-examination that he could not remember much about the meeting with Ambush, he insisted on this aspect of his testimony:  "Q.  And you agreed to pay the additional 10 percent if he was not paid by the Center?  A.  Exactly."  Ambush has various responses to this testimony, which we address in turn.

Ambush first argues that he never told the heirs that he would collect his ten percent fee only if the Center did not pay him.  As with the testimony regarding whether the heirs would be paid if they failed to sign the retainer agreements, a reasonable jury could have chosen to believe the testimony of Noemí and Eliezer Rodríguez and to disbelieve Ambush's testimony.  Thus, the jury could have concluded that Ambush misrepresented an important aspect of the retainer agreements.

Ambush also claims that testimony about what was said at the meeting constitutes extrinsic evidence that is inadmissible to determine the meaning of the retainer agreements.  See In re Advanced Cellular Sys., Inc., 483 F.3d 7, 12 (1st Cir. 2007).  But dolo involves an antecedent issue:  whether the retainer agreements are valid at all.  P.R. Laws Ann. tit. 31, § 3404 ("Consent given by . . . deceit shall be void.").  An invalid contract does not bind the parties, no matter how clear it is.  See Century Packing Corp. v. Giffin Specialty Equip. Co., 438 F. Supp. 2d 16, 26

(D.P.R. 2006) (stating that "a contract which lacks the necessary consent due to 'dolo' is null ab initio, i.e., from its inception").

Ambush further contends that a party to an agreement is bound by the agreement's clear terms even if she did not understand the agreement when she signed it. See Herman v. Hogar Praderas de Amor, Inc., 130 F. Supp. 2d 257, 262 (D.P.R. 2001). While it is true that a party to a contract generally cannot plead ignorance of the contract's terms, the contract is invalid nevertheless if the party was deceived into signing it. See Soto v. State Indus. Prods., Inc., 642 F.3d 67, 78 (1st Cir. 2011) ("In the absence of fraud, the fact that an offeree cannot read, write, speak, or understand the English language is immaterial to whether an English-language agreement the offeree executes is enforceable." (emphasis added) (quoting Morales v. Sun Constructors, Inc., 541 F.3d 218, 222 (3d Cir. 2008))). Regardless of how much the heirs understood about the retainer agreements, a reasonable jury could have concluded that Ambush's misrepresentations vitiated their consent.

In the alternative, Ambush claims that even if he did tell the heirs that he would receive his ten percent fee only if the Center did not pay him, this representation constituted not deceit but an oral amendment to the retainer agreements. The parties have informed us that, indeed, in September 2012 Ambush and

-16-

the Center settled their litigation against each other, with Ambush receiving $980,000 plus interest for his work on the Franqui litigation. If Ambush had verbally amended the retainer agreements to provide that his ten percent fee was contingent on the Center not paying him, he would be bound to return at least some money to the heirs. At oral argument before this court, however, Ambush's counsel said that Ambush does not intend to reimburse the heirs because the retainer agreements do not require him to do so. This would seem an uncomfortable position for Ambush to take when arguing that the evidence might support a finding of oral modification. In any event, the argument is beside the point in light of the jury's supportable finding of dolo.

Finally, Ambush argues that Rubén and Efraín Berganzo, who both graduated from high school and worked for the Puerto Rico Electric Power Authority, were sophisticated enough to make a knowing decision to execute the retainer agreements. See Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 12 (1st Cir. 2007) ("[W]hen examining efforts to invalidate consent, Puerto Rico courts consider the education, social background, economic status, and business experience of the challenger."). This defense fails. The cases in which a party has been held to a contract by virtue of that party's sophistication involve a lack of evidence of bad faith on the part of the defendant, id., a plaintiff that is a sophisticated business entity, Westernbank P.R. v. Kachkar, Civil

No. 07-1606 (ADC/BJM), 2009 WL 6337949, at *23-24 (D.P.R. Dec. 10, 2009), or both, CitiBank Global Markets, Inc. v. Rodríguez Santana, 573 F.3d 17, 29 (1st Cir. 2009).  Here, by contrast, Efraín Berganzo, who signed the retainer agreement himself and on behalf of his brother Rubén, was a high school graduate who testified to his understanding that if he did not sign the retainer agreement, his claim against Libya would not be processed.  A reasonable jury could have concluded that Berganzo was not sophisticated enough to know that Ambush was deceiving him about the consequences of failing to sign.

In summary, viewing the evidence and reasonable inferences in the light most favorable to the heirs, we believe that a reasonable jury could have concluded that Ambush misled them into signing the retainer agreements, and that Ambush's misrepresentations constituted dolo.  Similarly, the district court did not abuse its discretion in denying Ambush's motion for a new trial because the outcome was not against the clear weight of the evidence.

### B. The Non-Testifying Heirs' Dolo Claim

Although only five of the seven heirs testified at trial, the jury found that Ambush had committed dolo against all seven. The district court permitted this outcome because it considered the non-testifying heirs, Ángel and Ruth Rodríguez, to be parties to the case as representatives of their father's estate.  Ambush

-18-

contends that these heirs brought their claims only as individuals, and that they could not prove dolo without testifying about their reliance on Ambush's misrepresentations.

The district court's ruling implicates two difficult questions of Puerto Rico law:  the distinction between individual and inherited claims, and the extent to which a victory by an heir to an estate benefits the estate's other heirs.  We have described before "the unsettled state of governing Puerto Rico law" with respect to a similar issue:  whether all heirs to an estate are required parties under Rule 19 of the Federal Rules of Civil Procedure.  Jiménez v. Rodríguez-Pagán, 597 F.3d 18, 25 (1st Cir. 2010); see also Cruz-Gascot v. HIMA-San Pablo Hosp. Bayamon, 728 F. Supp. 2d 14, 21-26 (D.P.R. 2010) (discussing Jiménez and examining precedent on the issue).

We need not resolve these questions, however, because the testifying heirs presented enough evidence for the jury to conclude that Ambush deceived the non-testifying heirs into signing the retainer agreements.[2]  Ángel and Ruth Rodríguez are siblings of Noemí Rodríguez, who testified that "we signed because [Ambush] told us that if the Center didn't pay him then he would charge us that 10 percent, if the Center didn't pay him."  A reasonable jury

---

[2] Although this was not the district court's reason for refusing to dismiss the dolo claims of the non-testifying defendants, we may affirm the district court on any ground supported by the record.  In re Miles, 436 F.3d 291, 293-94 (1st Cir. 2006).

-19-

could have concluded that the word "we" referred at least to Noemí's siblings.  Although Ruth was absent from the meeting with Ambush and signed the retainer agreement a week later in Florida, there was enough evidence for a reasonable jury to infer that she did so for the same reasons as Noemí.  The testimony showed that in matters concerning her father's estate, Noemí was the family's leader; all of her siblings gave her power of attorney to represent them in the claim against Libya.  And while all of the Rodríguez heirs signed the retainer agreement as individuals, only Noemí signed on behalf of the estate as well.  This evidence allowed the jury to find in favor of the non-testifying heirs, regardless of whether they brought their claims individually or on behalf of their father's estate.  See Colón Rivera v. Promo Motor Imps., Inc., 144 P.R. Dec. 659, 669 (1997) (certified translation) ("[Deceit] can be established through inference or circumstantial evidence."); cf. St. Paul Fire & Marine Ins. Co. v. Ellis & Ellis, 262 F.3d 53, 62-63 (1st Cir. 2001) (holding, in a case involving fraud, that a jury could find reliance on the basis of circumstantial evidence).  Therefore, we agree with the district court (albeit on different grounds) that Ambush was not entitled to judgment as a matter of law, or a new trial, with respect to the non-testifying heirs' dolo claims.

### C. Jury Instruction on Dolo

Ambush also challenges the district court's instruction to the jury on the definition of dolo. Puerto Rico law distinguishes between two types of dolo: serious and incidental. Serious dolo "causes, motivates, serves as the basis for and leads to the execution of the contract, in such a manner that without it, it would not have been executed." Colón Rivera, 144 P.R. Dec. at 667. Incidental dolo, on the other hand, occurs when "the contract would have been executed anyway, but not under the same conditions." Id. "In order that deceit may give rise to the nullity of a contract, it must be serious," while "[i]ncidental deceit renders the party who employed it liable to indemnify for losses and damages only." P.R. Laws Ann. tit. 31, § 3409. At trial, Ambush proposed instructing the jury on both types of dolo. The heirs responded that they were making a claim of serious dolo only, and that a description of incidental dolo would confuse the jury. The court agreed with the heirs and instructed the jury with respect to serious dolo only, omitting any mention of incidental dolo. Ambush timely objected to this decision, and he argued in his motion for a new trial that he was prejudiced by the court's failure to instruct the jury on incidental dolo. The court denied that motion, and Ambush raises the same argument here.

"We review preserved challenges to jury instructions de novo, and look to the challenged instructions in relation to the

charge as a whole, asking whether the charge in its entirety--and in the context of the evidence--presented the relevant issues to the jury fairly and adequately." Sony BMG Music Entm't v. Tenenbaum, 660 F.3d 487, 503 (1st Cir. 2011) (internal quotation marks omitted). A trial court's "refusal to give a particular instruction constitutes reversible error only if the requested instruction was (1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point in the case." Gemini Investors Inc. v. AmeriPark, Inc., 643 F.3d 43, 48 (1st Cir. 2011) (internal quotation marks omitted).

Ambush does not dispute that the district court's instruction accurately described serious dolo, but he claims that without an instruction on incidental dolo, "the Jury was deprived of the correct legal frame work that would allow it to decide: (a) if there was evidence of dolo; and (b) the degree of dolo involved." Instead, "[t]he Jury was left free to find dolo on the basis of any conflict between Mr. Ambush's testimony and that of the other witnesses or on the basis of the Jury's own subjective judgment as to the purported insufficiency of any disclosure made by Mr. Ambush."

We disagree with Ambush's characterization of the jury instruction. In the district court, the heirs pursued a claim of serious dolo exclusively. As we have discussed above, the heirs

testified that their consent to the retainer agreements was based on Ambush's misrepresentations; no heir testified that he or she would have signed the retainer agreements anyway, but under different conditions.  In his closing argument at trial, the heirs' counsel reiterated that Ambush's misrepresentations induced the heirs to consent to the retainer agreements.  Ambush therefore was not entitled to an instruction on incidental dolo, a theory that the heirs did not pursue and that their testimony did not support.  Such an instruction likely would have confused the jury, as the district court recognized.  Because incidental dolo was far from "integral to an important point in the case," Gemini Investors Inc., 643 F.3d at 48, the district court's decision to omit Ambush's proposed instruction was not erroneous.[3]

### III.  Conclusion

We **affirm** the district court's judgment.

---

[3] At trial, Ambush's counsel seemed to recognize that the scope of the jury instruction on dolo should be limited by the scope of the heirs' claims.  When the heirs' counsel told the court that it was waiving any claim of incidental dolo, Ambush's counsel responded, "[L]et the record be clear that if there's no serious dolo then he has foreclosed any claim that the jury should have been instructed on incidental dol[o]."