# United States Court of Appeals
## For the First Circuit

No. 23-1353

CHASRICK HEREDIA,

Plaintiff, Appellee,

v.

MICHAEL ROSCOE,

Defendant, Appellant,

CANADA STEWART; MATTHEW NOCELLA; NATHAN HARRINGTON; OTHER
UNKNOWN MANCHESTER POLICE OFFICERS,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Gelpí, Montecalvo, and Rikelman,
Circuit Judges.

Keelan B. Forey, with whom Matthew V. Burrows and Gallagher,
Callahan & Gartrell, P.C., were on brief, for appellant.

Seth J. Hipple, with whom Stephen T. Martin and The Law
Offices of Martin & Hipple, PLLC, were on brief, for appellee.

January 6, 2025

**MONTECALVO, Circuit Judge.** In the early hours of the morning on May 11, 2018, while celebrating his birthday with a group of friends, plaintiff Chasrick Heredia encountered police officers in an interaction that quickly escalated to violence. As a result of that incident, Heredia filed a complaint against several of the officers involved, alleging violations of his constitutional rights. At a trial against four officers, the jury found Officer Michael Roscoe liable for use of excessive force and awarded Heredia nominal and punitive damages. Subsequently, the district court denied Roscoe's motion for judgment as a matter of law (JMOL), concluding that a reasonable juror could find that Roscoe violated Heredia's constitutional rights and that qualified immunity did not apply. The district court also denied Roscoe's motion for remittitur of the punitive damages award. Roscoe now appeals the district court's denial of both motions. For the reasons that follow, we affirm.

## I. Background

On May 11, 2018, Heredia had a violent interaction with officers from the Manchester Police Department, including Roscoe. As a result, Heredia filed a complaint alleging claims under 42 U.S.C. § 1983 for excessive force and violations of his right to due process (alleging both failure to provide medical care and fabrication of evidence). The circumstances surrounding the interaction were hotly contested by the parties throughout the

case. Because this case now comes before us on an appeal from a motion for JMOL, which was denied after the jury rendered a verdict in favor of Heredia, we summarize the evidence presented at trial in the light most favorable to the verdict. Jones ex rel. United States v. Mass. Gen. Hosp., 780 F.3d 479, 487 (1st Cir. 2015).

The evidence included testimony from people present at the scene, including: Heredia; the four defendants, Officers Roscoe, Canada Stewart, Matthew Nocella, and Nathan Harrington; Allyson Mateo, an employee for the nightclub outside of which the interaction occurred; and Harley Valley, Heredia's friend. A defense expert, Eric Daigle, also testified. Additionally, video evidence was presented at trial; that recording was made by Valley on his cell phone.[1]

## A. Video and Eyewitness Testimony

### 1. Lead-up to the Altercation

Heredia testified that he and his friends, including his brother, Joshua,[2] and Valley, arrived at a nightclub called GlowBar to celebrate his birthday around "10:00 to 11:00" p.m. on May 10, 2018.

---

[1] This recording is part of the appellate record, and we have reviewed it. See Bannon v. Godin, 99 F.4th 63, 69-70 (1st Cir. 2024) (reviewing "[t]raffic camera footage, officer body-worn cameras, and civilian cell phone footage").

[2] Joshua Heredia is referred to by his first name to avoid confusion.

Allyson Mateo, the GlowBar employee, was working that night and recalled that Joshua was asked to leave due to his behavior. Mateo followed the security guard and Joshua outside to observe their conversation. Mateo testified that Joshua was not being threatening or causing a scene, but the employees told him that he could not go back inside. Some of Joshua's friends came outside and began debating what they were going to do next and whether they should go somewhere else or split up. The group was asked to move away from the door while they were having this discussion, but they were not fighting, pushing each other, or threatening anyone.

Roscoe and Harrington testified that either very late on May 10, 2018, or in the early hours of May 11, 2018, they responded to a noise complaint at GlowBar, apparently unrelated to the incident with Joshua. Although Roscoe and Harrington cleared the noise complaint, they became concerned about some individuals who seemed to be arguing with a bouncer in front of the bar. Roscoe saw Joshua take off his shirt and speak to the employees in an animated manner. Although police presence was not requested by GlowBar staff, Roscoe decided to approach. Harrington and Stewart, who had since arrived on the scene, each testified that the GlowBar bouncer separately told them that the group needed to leave, although Roscoe testified that he heard the bouncer tell Joshua's

group that they had the option of going back inside GlowBar until closing.

Roscoe saw the group twice walk a bit away from GlowBar and then turn around and walk back. At this point, although the police still had not been asked to intervene by the GlowBar employees, Roscoe approached the group and ordered them to leave the area and get out of the public street. Harrington similarly ordered the group to get out of the street and to leave the area.

After noticing blue lights outside, Heredia exited the bar around this time, followed by Valley, to see what was happening. They then saw two to three police officers speaking with Joshua. Heredia began to ask the officers what was happening, and the officers responded that he "had to leave." Heredia testified that he told the officers that he was "going back inside" GlowBar, but the officers told him that "there would be consequences" if he did. Heredia and Valley then took out their cell phones to record the incident.[3]

Valley's video shows a group of people, including Heredia, being directed by officers to "get out of the street." Heredia admitted that when the officers continued to tell him he had to leave, he "became frustrated" and "rais[ed] [his] voice." Heredia was upset because he felt he "had done nothing wrong at

---

[3] Any recording taken by Heredia was not presented at trial.

the time" and "was just trying to go back inside."  Heredia told the officers that they were "public servants."  Stewart also recalled that Heredia shouted that the officers were racist, that they were public servants, and that it was his birthday.

Heredia's friends began telling him to leave and were "grabbing [his] arm [and] pulling [him]."  Valley testified that up until this point, he did not see anyone engage in physical violence or hear anyone make threats.  In the video, Heredia can then be heard telling someone, "stop fucking touching me," which the parties agree was directed at Heredia's friends.  Roscoe, Stewart, and Harrington recalled the group "pushing and shoving" each other in the middle of the busy street even though they were told to stop.

### 2. Initial Takedown of Heredia

In the video, someone can be heard calmly saying, "you're under arrest," at the same time that Heredia seems to be yelling at his friends, but it is unclear who said this and to whom. Shortly thereafter, an officer can be seen in the video grabbing Heredia from behind and forcing him against a parked car. Consistent with his report, Harrington testified that Roscoe then attempted to arrest Heredia, and several members of the group tried to pull Heredia away from Roscoe; however, only one other member of the group can be seen in the video when Harrington and Roscoe attempt to arrest Heredia, and it is unclear whether he is

- 6 -

attempting to pull Heredia away. Roscoe testified that when he attempted to effectuate the arrest, Heredia was not attempting to attack him or any other officer.

Roscoe testified that to effectuate the arrest, he "placed" Heredia against a vehicle and deployed "soft hand techniques" such as attempting to put Heredia's hands behind his back and putting him in an arm bar. Roscoe testified that Heredia removed his arm from Roscoe's grip and then continued to "pull[] his elbow back . . . to prevent [Roscoe] from maintaining that grip on his wrist and elbow."

Heredia's perspective of this initial arrest differed. When he was first thrown against the car, he "thought it might have been [his friend]" who did it. Because of this, he "immediately spun around to see who had just . . . thrown [him] into the vehicle," but when he realized it was an officer, he "immediately showed [the officer his] hands." The video also shows Heredia quickly turning around and then putting his hands in the air, one of which is holding his cell phone. Heredia testified that once he showed his hands in submission, he "thought [Roscoe] was just going to spin [him] around" again.

In the video, after Heredia puts his hands up, Roscoe grabs Heredia by the waist and throws him to the ground. Roscoe described this act as a takedown, whereby both Roscoe and Heredia ended up on the ground. Roscoe testified that he did this by

- 7 -

"lock[ing his] arms around [Heredia's] waist and . . . arch[ing his] hips." Heredia described this takedown as Roscoe "pick[ing] [him] up" and "slamm[ing] [him] off [his] head on the pavement." Heredia felt blood dripping onto his face. Heredia testified that after he hit his head, the impact "knocked [him] kind of out of consciousness and [he was] going in and out at this point." After the takedown, Heredia believed that the officers were not trying to arrest him and instead wanted to hurt him.

Roscoe testified that he was then able to immediately get on top of Heredia. Other officers also quickly surrounded Heredia. Roscoe testified that another member of Heredia's group then approached and pushed him, knocking him off balance. Roscoe stepped away from Heredia to push that person back and try to handcuff them.

### 3. Punches to Heredia's Head

Heredia testified that the next thing he remembered after the takedown was being on the ground on his side, with one arm underneath him holding his cell phone, and Stewart on top of him. At this time, other members of the group were physically involved with the officers. Stewart testified that she attempted to gain control of Heredia's legs, but Heredia kicked her in the chest and caused her "to fall off balance." Heredia can be seen in the video using both of his feet to push against or kick Stewart

in her chest. Heredia described this action as trying to use his feet to "lightly push[]" Stewart off of him.

While other officers were engaged with the rest of the group, Stewart remained on the ground with Heredia. In the video, Heredia can be seen grabbing Stewart by her hair bun with his left hand, while he is lying on the ground on his right side, and she is on top of him. Heredia testified that he grabbed Stewart by her hair with one hand to "get [her] off [him]" and held onto her hair for "a little over a second . . . at the most." Heredia also testified that while her hair was in one of his hands, his phone remained in the other.

Stewart testified that when she attempted to arrest Heredia, "he reached up and grabbed [her] hair and brought [her] head down to the ground and started punching [her] in the face." She said she threw two to three punches at Heredia in response.[4] Stewart testified that she was also screaming for Heredia to get off of her and to stop hitting her. Roscoe testified that he heard

_____

[4] The video only shows about a second of Heredia holding onto Stewart's hair before panning to the rest of the group; it does not show when he released her hair or any punches or hits exchanged between the two. Mateo testified that although he could see what was happening, he did not see Stewart or Heredia punch each other. Roscoe's report stated that he saw Heredia punch Stewart in the face at least two times. But Heredia testified that he never punched Stewart or pinned her head or face to the ground. Valley also testified that he never saw Heredia punch any of the officers. Based on the conflicting testimony, a reasonable juror could have found that Heredia did not punch Stewart.

Stewart yell out, and he "could hear the stress in her voice."[5] Roscoe then dropped his handcuffs and ran over to Stewart and Heredia.

The parties agree that Roscoe approached Heredia from above and behind.[6] Heredia testified that "immediately after" he let go of Stewart, Roscoe "punch[ed him] in the head." Roscoe described these hits as "hard hand techniques" or punches on the back of Heredia's head and face. Heredia testified that he had his phone in one of his hands up to that point, but after Roscoe started punching him "it went flying somewhere."[7] Mateo saw Roscoe punch Heredia in the head "more than . . . seven or eight times."

Roscoe testified that the purpose of these punches was "to make [Heredia] stop what he's doing with his hands and cover his face." Roscoe also testified that there was a time where Heredia "wasn't resisting, that he had his arms out, and [Roscoe] continued to punch." When Heredia can next be seen in the video, Roscoe is on top of him and repeatedly punching him in the head.

---

[5] At this time, Roscoe and Stewart were in an intimate romantic relationship.

[6] Stewart agreed that Roscoe then came back over and began "administering punches." However, she testified that she could not see his exact position because Heredia was holding her hair so that she was faced towards the ground.

[7] Heredia noted where in the video he believed you could see his phone in his right hand; around this time in the video, there does appear to be a rectangular object in his hand.

- 10 -

Stewart can be seen in a portion of the video, but it is unclear whether Heredia is still holding onto her; during at least some of the punches, Heredia's hands can be clearly seen not holding onto Stewart.

Roscoe stopped punching Heredia when Joshua came over and punched Roscoe. In response, Roscoe turned his attention to Joshua. Heredia was then "able to get up." Stewart also testified that after Roscoe was pulled away from Heredia, she was able to stand up and observed Heredia standing. Valley testified that after he observed officers punching Heredia, when Heredia was able to stand up, Valley told him to run.

### 4. Use of Taser Against Heredia

Heredia can then be seen attempting to move away from the officers. Stewart, joined by Nocella who had just arrived on the scene, tried to arrest him. Heredia was then pinned against a car by the officers. In the video, Stewart can be seen continuing to attempt to arrest Heredia, pushing him against a car with Nocella's help. Heredia testified that, during the struggle, Nocella "knee[d] [him] in the ribs or various areas in [his] body," which was consistent with Nocella's testimony and the video.

Roscoe testified that once he saw Stewart and Nocella trying to arrest Heredia, he unsuccessfully attempted to use his taser on Heredia. Stewart testified that she was instead shot by the taser in her left hand; in the video, Stewart appears to have

a physical reaction to the taser after its deployment. Heredia can be seen in the video continuing to struggle with the two officers against the vehicle when Roscoe first deploys his taser.

In the video, Nocella then takes Heredia to the ground. The video again pans away from Heredia, but a taser can be heard deploying in the background. Roscoe testified that he had again fired his taser at Heredia when Heredia was on the ground with Nocella. Heredia testified that he was telling the officers that he was trying to put his hand behind his back when the taser was deployed for the second time.

When Heredia can next be seen in the video, approximately fifteen seconds after initially being taken to the ground by Nocella, he is lying on the ground on his stomach with one hand behind his back and is surrounded by several officers, including one with a dog. Heredia testified that "[his] arm [was] kind of stuck up against the curb and . . . [he] couldn't really move it." In the video, officers can be heard repeatedly telling Heredia to put his hands behind his back. In response, Heredia told the officers that he was trying to do so. After a couple of seconds of back and forth, officers can be seen putting handcuffs on Heredia.

### 5. Removal of Taser Prongs

During this portion of the video, Roscoe can be seen in the background holding his taser with the wires extending from his

taser to Heredia's back. Heredia testified that after he was tasered, the prongs of the taser were "ripped out of [his] back." Heredia believed that Roscoe was the officer who took the prongs out.

The last Heredia is seen on the video, he is being lifted onto his feet by officers and escorted away.

### 6. Injuries Sustained

Roscoe was taken to the hospital in an ambulance and described his injuries as a concussion, cervical strain of the neck, and minor scrapes and cuts. He described Heredia's injuries as merely minor cuts and scrapes to the face. Roscoe also testified at trial that "[i]f this exact scenario played out again," he would respond in the same way.

Stewart was also taken by ambulance to the hospital, where she told staff that she received multiple blows to the head. In a report, Stewart also stated that she sustained a concussion, bruises, scratches, and whiplash. A photo of Stewart at the end of the night did not show any visible marks or bleeding on her face. Although Valley had continued to speak with and record the officers after the incident, he testified that he did not see any visible injuries on Stewart. Stewart also reported that Heredia sustained scratches based on his booking photo.

In contrast with the officers' testimony, Heredia testified that he had welts on his head and a cut on his nose, he

was bleeding from his face or head, and he could feel blood saturating the back of his shirt from having the taser prongs ripped out. Valley also testified that Heredia's clothes had been ripped and that he was bleeding when arrested. Heredia did not receive medical attention at the scene, despite telling the officers that he was hurt. He also did not go to the hospital. Photographs of Heredia from several days after the incident showed that his knuckles and tops of his hands did not have any markings or injuries. He had two black eyes, which were swollen, and a cut on his nose. Injuries could also be seen where the taser prongs were removed from Heredia's back.

### 7. Criminal Charges

After the incident, Heredia was charged with attempted murder for allegedly punching Stewart in the head, based on the officers' reports and statements. He was also charged with several other felony and misdemeanor counts. Ultimately, Heredia pled guilty to one count of felony riot, one count of misdemeanor disorderly conduct,[8] two counts of misdemeanor resisting arrest for his struggles with Roscoe and Nocella, and one count of felony resisting arrest for his struggle with Stewart. Heredia testified

---

[8] Although Heredia's guilty plea to the misdemeanor disorderly conduct was not included in the appellate record, the parties and the court repeatedly referred to the plea at trial. Because it does not change the outcome of our analysis (see Section II.A below), we assume, consistent with the record, that Heredia pled guilty to misdemeanor disorderly conduct.

that, at his plea colloquy, he made clear that he was not admitting to punching Stewart; the plea was ultimately accepted by the court because the punch was not a necessary element of the offense.

## B. Defendants' Expert Testimony

At trial, the defendants called Eric Daigle as an expert. Daigle owns a law firm focused on "law enforcement operations and corrections operations and the security industry." Daigle opined that the force used by each officer "was necessary based on the facts and circumstances that they faced[,] and it was in line with department policy and industry standards applicable to use of force." Specifically, he testified that the takedown used by Roscoe was effective and would limit injury because Roscoe wrapped his arms around Heredia and fell in such a way that Heredia would fall on top of Roscoe. As to the "hard hand techniques" or punches used by Roscoe, Daigle opined that those too were necessary "based on the fact that Detective Stewart was kicked, that the bun of her hair was grabbed, and her head was slammed down to the ground and that there was [sic] punches that . . . was [sic] received by Detective Stewart at that time."

On cross-examination, Daigle testified that in forming his opinions he watched the video and reviewed testimony and evidence; to the extent the video was not clear at certain times, he primarily relied on the officers' version of events to analyze their use of force. Daigle also testified that his review of the

evidence led him to conclude that Heredia was actively resisting arrest prior to the initial takedown but that the jury may have a different interpretation that leads them to a different conclusion. Further, Daigle testified that if Heredia was not actively kicking, pulling the hair of, or punching Stewart, it would be "inappropriate" for Roscoe to have punched Heredia. Similarly, he testified that if Heredia went "limp" while Roscoe was punching him, it would not be appropriate for Roscoe to continue doing so.

### C. Motions Following the Close of Evidence

Prior to closing arguments, defendants moved for directed verdict as to all four officers in relation to all claims. The court granted JMOL as to Roscoe, Stewart, and Harrington on the medical care claims and as to Nocella and Harrington on the fabrication of evidence claims. The district court "reserv[ed] judgment" as to the remaining claims, allowing the failure to provide medical care claim against Nocella, the fabrication of evidence claims against Stewart and Roscoe, and the excessive force claims against all four defendants to go to the jury.

### D. Jury Verdict

The jury found in favor of Heredia on the excessive force claim against Roscoe and awarded Heredia $1 in nominal damages and

$2,000 in punitive damages. The jury found in favor of the defendants on all other claims.

### E. Post-trial Motions

After the verdict was rendered, the district court asked the parties to file post-trial briefs on the reserved JMOL motion, including argument on the sufficiency of the evidence to support a punitive damages award. Roscoe also renewed his motion under Rules 50(a) and 50(b) of the Federal Rules of Civil Procedure "with regard to moving for judgment on two grounds: Number one, insufficient evidence to support the claim as well as the punitive damage claim; and, secondly, the application of qualified immunity by the [c]ourt." He also moved for a new trial or to alter or amend the judgment under Rule 59.[9]

In his post-trial brief, Roscoe asked the court to grant JMOL in his favor on the excessive force claim or, in the alternative, remit the jury's award of punitive damages. Roscoe argued that his use of force was objectively reasonable under the circumstances. Roscoe also argued that, even if the force used was excessive, he was entitled to qualified immunity. Lastly, in

---

[9] In his written briefing and on appeal before this court, Roscoe only refers to Rule 59 in request of "a remittitur of punitive damages." The only reference to a request for a new trial is in passing below; there is no developed argument related to a motion for a new trial request either before the district court or before us now on appeal. Thus, our review is limited to the motion for JMOL and for remittitur of the punitive damages.

the alternative, Roscoe argued that the judgment should be altered to eliminate the award of punitive damages "because there is no evidence that [he] acted with evil motive or evil intent" and "there was no evidence that [his] conduct was the sort that called for deterrence and punishment over and above that provided by compensatory damages."

In response, Heredia argued that "[t]he [j]ury had substantial evidence before it to conclude that the force Roscoe used was objectively unreasonable in light of the circumstances confronting him." Further, Roscoe was not entitled to qualified immunity because "no reasonable officer could presume that the force used in those circumstances was appropriate." Lastly, Heredia argued that "the [j]ury could have found that . . . [Roscoe] did not care that the force was excessive and did it solely to punish [Heredia] rather than lawfully effect his arrest," and therefore the punitive damages were appropriate.

On March 14, 2023, the district court denied the motions for JMOL and for remittitur in a text order, stating, "I deny the motion for the reasons set forth in the plaintiff's objection." On March 17, 2023, the judgment was entered against Roscoe on the excessive force claim and reflected the nominal and punitive damages that had been awarded to Heredia.

On April 13, 2023, Roscoe filed a notice of appeal as to the entry of judgment against him.

## II. Discussion

We review the denial of the motion for JMOL and the denial of the motion for remittitur in turn.

### A. Motion for Judgment as a Matter of Law

On appeal, Roscoe argues that we should reverse the district court's denial of his motion for JMOL because he believes the trial evidence "overwhelmingly" favors him under the analysis established in Graham v. Connor, 490 U.S. 386 (1989), and so his use of force was reasonable. See id. at 396. And, even if Roscoe violated Heredia's constitutional rights, Roscoe argues that an officer in his position would not have understood that his use of force in these circumstances was excessive; thus, qualified immunity should apply. For the reasons that follow, we disagree on both points.

### 1. Standard of Review

We review the denial of a motion for JMOL "de novo, examining the evidence and reasonable inferences therefrom in the light most favorable to the nonmovant." Jones, 780 F.3d at 487 (quoting Estate of Berganzo-Colón ex rel. Berganzo v. Ambush, 704 F.3d 33, 38 (1st Cir. 2013)). "This standard is demanding, and 'a party seeking to overturn a jury verdict faces an uphill battle.'" Id. (quoting Estate of Berganzo-Colón, 704 F.3d at 38). We "will uphold the verdict unless the facts and inferences, viewed in the light most favorable to the verdict, 'point so strongly and

overwhelmingly in favor of the movant that a reasonable jury could not have returned the verdict.'" Acevedo-Diaz v. Aponte, 1 F.3d 62, 66 (1st Cir. 1993) (cleaned up) (quoting Hendricks & Assocs., Inc. v. Daewoo Corp., 923 F.2d 209, 214 (1st Cir. 1991)).

## 2. Constitutional Violation

Heredia asserts that Roscoe used excessive force in at least four instances: (1) when he performed the initial takedown on Heredia, (2) when he repeatedly punched Heredia in the head while Heredia was on the ground, (3) when he tasered Heredia for the second time while he was on the ground and surrendering, and (4) when he removed the taser prongs from Heredia's back. To affirm the denial of JMOL, we need only determine that, taking the facts in the light most favorable to Heredia, a reasonable jury could have found excessive force in any one of these instances. Because further analysis is unnecessary, we focus our inquiry on the first alleged instance of excessive force: Roscoe's initial takedown of Heredia.

We first briefly summarize the facts a jury could have found, resolving all factual disputes in favor of the jury verdict. From the evidence before it, the jury could have found the following: Heredia was yelling at officers who were giving him lawful orders and at his friends, several of whom were encouraging him to leave the area. At some point, without warning, Roscoe grabbed Heredia from behind in an attempt to arrest him and put

him in an arm bar.  Heredia, thinking he was being grabbed by a friend, struggled against Roscoe until he was able to turn around.  Once facing Roscoe and realizing that an officer had grabbed him, Heredia raised both hands with his palms faced outward, surrendering to arrest.  At this point, after Heredia had submitted, Roscoe increased his use of force and performed a takedown, which involved bringing Heredia onto the ground and hitting Heredia's head on the pavement.

In light of these facts, we evaluate whether this takedown was an excessive use of force under the circumstances.

To establish an excessive force claim under the Fourth Amendment, "a plaintiff must show that the defendant officer employed force that was unreasonable under the circumstances." Jennings v. Jones, 499 F.3d 2, 11 (1st Cir. 2007).  The reasonableness of the use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. (quoting Graham, 490 U.S. at 396).  This is an objective inquiry, "to be determined 'in light of the facts and circumstances confronting the officers, without regard to their underlying intent or motivation.'" Id. (cleaned up) (quoting Graham, 490 U.S. at 397).

"There must be 'careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat

- 21 -

to the safety of the officers or others, and whether [they are] actively resisting arrest or attempting to evade arrest by flight.'" Id. (quoting Graham, 490 U.S. at 396). Roscoe argues that each of these factors described in Graham weigh in his favor.

As to the first factor -- the severity of the crime at issue -- Roscoe argues that because Heredia pled guilty to several felony and misdemeanor level offenses related to this incident generally, this factor must weigh in his favor. Roscoe does not focus on any particular instance of use of force during the incident, but rather the situation as a whole. However, this court has favored a segmented approach in reviewing use of force claims when appropriate, particularly when the circumstances between uses of force change. See Lachance v. Town of Charlton, 990 F.3d 14, 24-25 (1st Cir. 2021). "After all, if the reasonableness of an officer's use of force depends on the information available to that officer under a particular set of circumstances, which appear to have meaningfully changed between one use of force and another, then it only makes sense to consider those uses separately." Id. at 25-26. Here, Roscoe does not isolate any of Heredia's conduct prior to the takedown as the basis for any of the charges he pled to. In reviewing the charges Heredia pled guilty to, the only charges that could reasonably be based on Heredia's behavior prior to the takedown were the misdemeanor charges of disorderly conduct and resisting arrest "when Chasrick Heredia struggled with Officer

Roscoe as he attempted to handcuff him."[10]  Thus, although resisting arrest, in particular, is not a slight infraction, the severity of the crimes at issue is not so significantly weighted in Roscoe's favor as he contends.

When faced with the second Graham factor -- whether the suspect poses an immediate threat to the safety of the officers or others -- Roscoe asserts that this again weighs in his favor because Heredia held Stewart's hair and Stewart was screaming for help.  However, those alleged acts again occurred after the takedown at issue and so are irrelevant to our analysis of whether the takedown constituted an excessive use of force.  Roscoe says nothing about the risk to officers or others before he initially attempted to arrest Heredia or in the moments before the takedown occurred.  In fact, Roscoe specifically testified that prior to the initial attempted arrest, Heredia was not attempting to attack anyone.  Even so, a risk to others was not entirely absent.  The members of the group were pushing and grabbing each other on or near a busy public street, and Heredia initially resisted arrest.  However, Roscoe does not identify any threat after Heredia turned around, realized it was an officer who pushed him against the

_____

[10] Heredia did not challenge that the officers had probable cause to arrest him prior to this specific count of resisting arrest.  However, Roscoe has not developed any argument as to what other crimes Heredia's conduct amounted to prior to the attempted arrest and how "severe" those crimes would be to justify the use of force.

vehicle, and raised his hands in submission. For these reasons, Roscoe has simply not pointed to an "immediate threat" that justified the takedown.

Roscoe's argument on the third Graham factor -- whether an arrestee is actively resisting arrest or attempting to evade arrest by flight -- suffers from the same deficiencies that his argument on the first factor does. Roscoe again relies on Heredia's guilty plea to three counts of resisting arrest to argue that this factor indisputably weighs in his favor. But Roscoe does not identify which parts of Heredia's conduct, if any, might have justified the takedown. And Roscoe again has not addressed Heredia's testimony that he was no longer actively resisting arrest at the time of the takedown and, instead, was raising his hands in surrender.

Thus, where the severity of the crime was not so substantial, the threat involved was no longer "immediate," and Heredia was not "actively" resisting arrest, the Graham factors collectively weigh in favor of finding that Roscoe's use of force in effectuating the takedown was unreasonable. And Roscoe has not presented any particularized argument to the contrary with respect to the takedown.

Surely, much like the situation presented in Jennings, the police here faced a challenging situation. See 499 F.3d at 11. Like the plaintiff there, Heredia was indisputably challenging

- 24 -

authority and, at times, resisting arrest.  See id.  Thus, we similarly recognize that "[i]n making an arrest, a police officer has 'the right to use some degree of physical coercion or threat thereof to effect it.'"  Id. (quoting Graham, 490 U.S. at 396).  However, again like in Jennings, Heredia focuses not just on the use of force, but the increased use of force in performing the takedown after he had already put both hands up and submitted to officers.  See id. at 11-12.

In addition to his broader Graham argument, Roscoe argues, as another basis for reversal, that Heredia did not present any evidence regarding the reasonableness of Roscoe's conduct and points specifically to the lack of expert testimony in Heredia's favor.  However, he ignores our precedent, which does not require expert testimony in every circumstance.  Instead, "evidence may be in the form of 'expert testimony, lay testimony, or other evidence,' as long as 'the jury could evaluate the reasonableness of [the officer's] conduct.'"  Raiche v. Pietroski, 623 F.3d 30, 36 (1st Cir. 2010) (quoting Jennings, 499 F.3d at 15 n.15).  In particular, "case[s] involving force applied with bare hands, d[o] not [necessarily] require expert testimony to establish whether the force used was reasonable."  Jennings, 499 F.3d at 15.  "[T]his case involves the common sense proposition that it is not reasonable for police officers to increase their use of physical

force after an arrestee who has been resisting arrest stops resisting" and puts his hands up in submission. See id.

Indeed, a jury could have used common sense to conclude that throwing Heredia to the ground and causing his head to hit the pavement after he raised his hands and submitted to arrest was unreasonable. See Raiche, 623 F.3d at 37 n.2. But Heredia also elicited testimony on cross-examination of defendants' expert witness that there was an interpretation of the facts here that could lead to the conclusion that the force used by Roscoe was excessive. For these reasons, the jury had sufficient evidence before it to evaluate the reasonableness of Roscoe's conduct.

Thus, a reasonable jury could conclude from the evidence that Roscoe unreasonably escalated his use of force in performing the takedown after Heredia had stopped resisting arrest and that this use of excessive force violated Heredia's Fourth Amendment rights.

### 3. Qualified Immunity

Roscoe next argues that, even if Heredia's constitutional rights were violated, he is shielded from liability under the doctrine of qualified immunity.

"[T]he availability of qualified immunity after a trial is a legal question informed by the jury's findings of fact, but ultimately committed to the court's judgment." Raiche, 623 F.3d at 35 (quoting Acevedo-Garcia v. Monroig, 351 F.3d 547, 563 (1st

Cir. 2003)). "[T]o determine whether qualified immunity applies in a given case, we must determine: (1) whether a public official has violated a plaintiff's constitutionally protected right; and (2) whether the particular right that the official has violated was clearly established at the time of the violation." Id. "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what they are doing is unlawful." Segrain v. Duffy, 118 F.4th 45, 57 (1st Cir. 2024) (cleaned up) (quoting District of Columbia v. Wesby, 583 U.S. 48, 63 (2018)). In the Fourth Amendment context, "[a]lthough excessive force is by definition unreasonable force, 'reasonable people sometimes make mistaken judgments, and a reasonable officer sometimes may use unreasonable force.'" Mlodzinski v. Lewis, 648 F.3d 24, 33 (1st Cir. 2011) (quoting Morelli v. Webster, 552 F.3d 12, 24 (1st Cir. 2009)).

We have already determined above that a jury could find from the evidence that Roscoe violated Heredia's constitutional rights under the Fourth Amendment by using excessive force in performing the takedown. Thus, we focus the remainder of our qualified immunity analysis on the second prong: was the right to be free from an increased use of force, after the arrestee had submitted to arrest and put up his hands, clearly established at the time of the incident?

"[A] violation is clear 'either if courts have previously ruled that materially similar conduct was unconstitutional,' or if the conduct was 'such an obvious violation of the Fourth Amendment's general prohibition on unreasonable force that a reasonable officer would not have required prior case law on point to be on notice that his conduct was unlawful.'" Raiche, 623 F.3d at 38 (quoting Jennings, 499 F.3d at 16-17). Here, we ask whether precedent put Roscoe on notice that it was unconstitutional for him to effectuate the takedown or whether the takedown was such an obvious violation of the Fourth Amendment that prior case law was not required given the other surrounding circumstances.

Our precedent has clearly established that the conduct here was a violation of the Fourth Amendment. In Jennings,[11] after finding that the constitutional violation there was obvious, this court noted other cases concluding that "the law was clearly

_____

[11] Roscoe argues that Heredia "did not set forth any precedent" upon which the district court could have relied in denying qualified immunity. However, Heredia cited to Jennings both in his filing below and before us. Essentially, what Roscoe argues instead is that, viewing the facts in the light most favorable to him, Jennings does not apply. This is not how we conduct our review; taking the facts in the light most favorable to the jury verdict, Jennings clearly has applicability here. Further, we are not limited to the cases cited by the parties. Barton v. Clancy, 632 F.3d 9, 22 (1st Cir. 2011) ("In conducting a qualified immunity analysis, a court should 'use its full knowledge of its own and other relevant precedents.'" (cleaned up) (quoting Elder v. Holloway, 510 U.S. 510, 516 (1994))).

established against the use of increased force on a suspect no longer offering resistance because 'the unlawfulness of the conduct is readily apparent even without clarifying case[ ]law.'" 499 F.3d at 17 (quoting Smith v. Mattox, 127 F.3d 1416, 1420 (11th Cir. 1997)). This conclusion was reiterated in Raiche, where this court held that "[a] reasonable officer with training on the Use of Force Continuum would not have needed prior case law on point to recognize that it is unconstitutional to tackle a person who has already stopped in response to the officer's command to stop and who presents no indications of dangerousness." 623 F.3d at 39. Thus, under Jennings and Raiche, we find that it was clearly established that it is unconstitutional for an officer to use a takedown maneuver to take an arrestee to the ground, hitting the arrestee's head on the pavement, after the arrestee had already shown his hands and submitted to arrest.[12]

Every reasonable officer would understand that this conduct was unlawful based on our prior case law. See Segrain, 118 F.4th at 57. This case has significant overlap with those

---

[12] Roscoe cites only one, nonprecedential in-circuit case to rebut the argument that the takedown constituted a clearly established violation of the Fourth Amendment. That case involved a significantly different factual scenario than the one at present. See Therrien v. Town of Jay, 483 F. Supp. 2d 19 (D. Me. 2007). In Therrien, an officer effectuated a takedown only after an extended chase of the arrestee, during which the arrestee once stopped for officers and then again drove off. Id. at 26. The officer there was also alone when he decided to effectuate the takedown. Id. Thus, Therrien does not put our prior case law in question.

- 29 -

cases where this court has previously found Fourth Amendment violations and where officers were not protected by qualified immunity. A jury could find: that Heredia was not given any warning before he was initially grabbed by an officer, see Ciolino v. Gikas, 861 F.3d 296, 304 (1st Cir. 2017) (plaintiff "was not given a chance to submit peacefully to arrest before significant force was used to subdue him"); that prior to Roscoe grabbing him, Heredia did not present an immediate threat to officers, see Morelli v. Webster, 552 F.3d 12, 24 (1st Cir. 2009) (describing "the absence of any evidence of either dangerousness or attempted flight[] and the presence of a cadre of other officers at the scene" as factors that tip against the reasonableness of the use of force); that after initially resisting, Heredia ultimately submitted to arrest and Roscoe increased the use of force, see Jennings, 499 F.3d at 19 (finding that "an objectively reasonable officer in [defendant's] circumstances would not have believed that it was lawful to increase the amount of force that he used after [plaintiff] ceased resisting and stated that [defendant] was hurting him"); and that Roscoe used significant force in throwing Heredia on his head onto the pavement, see Raiche, 623 F.3d at 39 ("[I]t is unconstitutional to tackle a person who has already stopped in response to the officer's command to stop and who presents no indications of dangerousness."). Under these circumstances, in view of our prior case law, every reasonable

officer would have known this conduct violated Heredia's constitutional rights.

Accordingly, we affirm the denial of Roscoe's motion for JMOL on Heredia's § 1983 excessive force claim.

## B. Motion for Remittitur

In the alternative, Roscoe argues that we should remit the punitive damages award. He argues that there was no evidence that he harbored any malice or acted with reckless indifference to Heredia's constitutional rights, and, therefore, the punitive damages award cannot be justified. Essentially, Roscoe asks the court to remit the punitive damages award to zero.

"A jury may levy punitive damages in a section 1983 action when a defendant's conduct is 'shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" Casillas-Díaz v. Palau, 463 F.3d 77, 84 (1st Cir. 2006) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)). "[P]unitive damages are reserved for instances where the defendant's conduct is of the sort that calls for deterrence and punishment over and above that provided by compensatory damages." Davet v. Maccarone, 973 F.2d 22, 27 (1st Cir. 1992) (quoting Hernández-Tirado v. Artau, 874 F.2d 866, 869 (1st Cir. 1989)).

We need not belabor the resolution of this issue. On the evidence recounted above, a jury could find that Roscoe acted

with a reckless indifference to Heredia's Fourth Amendment rights. A jury could have found that, with other officers in the vicinity, Roscoe decided to throw Heredia to the ground, hitting his head, after Heredia had submitted to arrest. Roscoe also testified that he did not think Heredia presented an immediate risk to the officers at the time Roscoe initially grabbed him. The cases cited above also put Roscoe and officers on notice that such actions risk violating the law. See Méndez-Matos v. Mun. of Guaynabo, 557 F.3d 36, 49 (1st Cir. 2009) ("The existence of an extensive body of federal law on a particular issue also may suggest that the defendant must have been aware of the risk of violating that law."). Given these facts and the other surrounding circumstances, a jury could find that punitive damages were appropriate here.

As to the extent of a punitive damages award, "[t]he review of a preserved challenge to a punitive damages award 'is de novo, and the award will stand unless we find it certain that the amount in question exceeds that necessary to punish and deter the alleged misconduct.'" Acevedo-Garcia, 351 F.3d at 566 (quoting Romano v. U-Haul Int'l, 233 F.3d 655, 672 (1st Cir. 2000)). "Consequently, defendants bear the onerous burden of proving to our satisfaction that the damage award was 'grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand.'" Id.

(quoting <u>Correa</u> v. <u>Hosp. San Francisco</u>, 69 F.3d 1184, 1197 (1st Cir. 1995)).

Roscoe has not met his burden here. Although he presented argument as to whether punitive damages were appropriate <u>at all</u>, which we have rejected, he did not present any argument as to why, if such damages are generally appropriate, the $2,000 awarded here was excessive. Thus, any such argument is waived. <u>See</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

For these reasons, we affirm the denial of the motion for remittitur.

### III. Conclusion

For the foregoing reasons, we <u>affirm</u> the district court's denials of the motions for JMOL and remittitur.